IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | | |
|---|---|---|
| Mireille Kotoklo | ) | |
|     Plaintiff, | ) | Hon. Joan B. Gottschall |
| v. | ) | |
| | ) | Magistrate Judge M. David Weisman |
| Robert Karpinski and DePaul University | ) | |
|     Defendants. | ) | No. 20–cv–635 |
| _____ | ) | |

## Memorandum of Law In Support of Mireille Kotoklo's Motion For Partial Summary Judgment

Mireille Kotoklo is a black immigrant, originally hailing from Côte d'Ivoire in West Africa. (Statement of Facts, ¶¶ 2, 3.) From November 15, 2000 to October 3, 2019, she served as the Access Services Coordinator at the library at DePaul University's ("DePaul") Lincoln Park campus. (Id. at ¶1.) In 2019, Ms. Kotoklo was tasked with chairing search committees to fill two positions within her department—a day circulation supervisor and a night circulation supervisor. (Id. at ¶9.) The duties of the day circulation supervisor position and the night circulation supervisor are similar; however, the night circulation supervisor has less responsibility. (Id. at ¶10.) The process for hiring the day circulation supervisor proceeded normally: a search committee was formed, the search committee reviewed resumes and conducted interviews, the search committee recommended that DePaul hire Matthew Wedge (a white man), and Robert Karpsinski (a white man and the head of DePaul's library) hired Mr. Wedge without a second thought. (Id. at ¶11.) The process for hiring the night circulation supervisor was a completely different story.

The search committee for the night circulation supervisor position included Ms. Kotoklo, Travis Eastham (a white man), and Firouzeh Rismiller (a white woman). (Id. at ¶12.) This committee recommended that DePaul hire Dilnesa Eshete, an immigrant originally from Ethiopia, a former DePaul employee, and a cancer survivor. (Id. at ¶¶13–15.) On September 17, 2019 at 9:30

a.m., Mr. Karpinski met with the search committee, which confirmed its recommendation that DePaul hire a black immigrant. (*Id.* at ¶¶18–19.) No more than three hours later, Mr. Karpinski decided to fire Ms. Kotoklo. (*Id.* at ¶¶19, 21.) Why? Because she chaired the committee that refused to take Mr. Eshete out of contention for a job. How do we know? Mr. Karpinski said so:

> Q.    Okay. And it's fair to say at this point you decided you wanted to fire Miss Kotoklo?
>
> A.    I wanted ~ yes, and I wanted HR's help.
>
> Q.    Okay. What was the last straw?
>
> A.    It wasn't a matter of it being a last straw. It was a compilation of losing trust in her ability to lead that department along with the fact that the search process ~ the way the search process was handled for Dil, Mr. Eshete.

(*Id.* at ¶21 *citing* Karpinski Dep. 232:12–233:1.)

In other words, we would not be in this Court if Ms. Kotoklo had done what Mr. Karpinski wanted, which was for her to remove Mr. Eshete from consideration as the night circulation supervisor. (*See id.* at ¶75.) Even Ashley McMullin, Mr. Karpinski's hand-picked choice to serve as Ms. Kotoklo's direct supervisor (*see id.* at ¶74), recognized this retaliatory dynamic. As Ms. McMullin explained, although Ms. Kotoklo did not generally refuse her employer's instructions (*id.* at ¶36), she refused to retract her recommendation that DePaul hire Mr. Eshete because she could think of no legitimate reason for doing so (*Id.* at ¶76).

### Additional Facts

**A.    Ms. Kotoklo's tenure within the library and Robert Karpinski's animus.**

Prior to her termination, Ms. Kotoklo had served DePaul for nearly nineteen years with no blemish recorded in her personnel file and no record of progressive discipline. (*Id.* at ¶¶1, 22.) As the Access Services Coordinator, Ms. Kotoklo reported directly to an associate university librarian.

2

(*Id.* at ¶23.) At the time of Ms. Kotoklo's termination, that position was held by Ms. McMullin. (*Id.*)

In December 2018, Mr. Karpinski became the head of DePaul's library. (*Id.* at ¶24.) A few months later—on March 21, 2019—Mr. Karpinski called a meeting with Ms. Kotoklo where he (falsely) accused her of an inability to lead. (*Id.* at ¶25.)[1] Six and a half months later, Mr. Karpinski terminated Ms. Kotoklo's employment, ostensibly for a lack of honesty and for a lack of confidence in her ability to lead the Access Services Department. (*Id.* at ¶¶1, 33.) But what was the real reason for his decision? It was that Ms. Kotoklo refused to take a black immigrant out of contention for a job despite the unanimous recommendation of the search committee tasked with identifying a candidate for that job.

## B.    Mr. Karpinski's campaign against two black immigrants.

In September 2019, the committee identified Mr. Eshete as its preferred candidate to serve as the night circulation supervisor. (*Id.* at ¶34.) Accordingly, Ms. Kotoklo asked for—and received—permission from human resources to interview only Mr. Eshete. (*Id.*) Mr. Karpinski, however, inserted himself into the process and told Ms. Kotoklo (i) to identify and interview at least three candidates for the position, (ii) to send all of the top candidate's resumes and cover letters to Ms. McMullin, and (iii) that he wanted to meet with her and Ms. McMullin prior to Mr. Eshete's interview to discuss Mr. Eshete's candidacy. (*Id.* at ¶¶35, 37–38.)

---

[1]    There is no legitimate dispute that the allegations of Ms. Kotoklo's inability to lead were an attempt to paper the file. How do we know? Because when Ms. Kotoklo asked for examples about her alleged inability to lead during her meeting, Mr. Karpinski could not provide them. (*Id.* at ¶26.) Although Mr. Karpinski promised to follow up with Ms. Kotoklo, it took him forty days to do. (*Id.* at ¶¶27–30.) But when Ms. Kotoklo sent an email telling Mr. Karpinski that she believed he was trying to create a paper trail, Mr. Karpinski was able to react to that within an hour. (*Id.* at ¶¶31–32.) What was Mr. Karpinski's response to Ms. Kotoklo's email? Not to respond substantively to her (now multiple) requests for feedback but to ask human resources for help in crafting a response. (*Id.* at ¶32.)

On September 6, Mr. Karpinski, Ms. McMullin, and Ms. Kotoklo met to discuss the "concerns" that Mr. Karpinski had about Mr. Eshete's candidacy. (*Id.* at ¶38.) What were they? That Mr. Eshete had a history of attendance issues while previously employed by DePaul. (*Id.*) Why did Mr. Eshete have these issues? Because he was undergoing treatment for brain cancer. (*Id.* at ¶39.) Ms. Kotoklo told Mr. Karpinski and Ms. McMullin that Mr. Eshete's absences had been due to illness during that September 6th meeting. (*Id.* at ¶40.) When Mr. Karpinski and Ms. McMullin failed to ask follow-up questions about Mr. Eshete's illness during that meeting (*see id.* at ¶78), Ms. Kotoklo thought that the matter had been resolved.

Mr. Karpinski and Ms. McMullin also claim that Mr. Eshete had received preferential treatment from Ms. Kotoklo. (*Id.* at ¶38.) Yet when asked what preferential treatment Mr. Eshete allegedly received, Mr. Karpinski and Ms. McMullin simply pointed to the fact that Mr. Eshete had had attendance issues. (*Id.* at ¶41.) Yet it was Ms. Kotoklo who issued progressive discipline to Mr. Eshete for these attendance issues, suggesting no one legitimately believed that Ms. Kotoklo favored Mr. Eshete by excusing his prior attendance issues. (*See id.* at ¶62.)

1. **The search committee's recommendation that DePaul rehire Mr. Eshete.**

Following Mr. Karpinski's instructions, the search committee identified and interviewed the top three prospective candidates for the night circulation supervisor position. (*Id.* at ¶41.) Each of these candidates were graded on an objective scale, and each member of the search committee graded each candidate. (*Id.* at ¶43.) In addition to interviewing with the search committee, each candidate also interviewed with Ms. McMullin. (*Id.* at ¶44.) Following those interviews, DePaul's office of human resources checked each candidate's references.[2] (*Id.* at ¶46.) At the end of the pro-

---

[2]    Unbeknownst to Ms. Kotoklo or Mr. Eastham, Mr. Eshete listed both of them as references for the night circulation supervisor position. (*Id.* at ¶47.) When Ms. Kotoklo learned she had been listed as a refer-

cess, Mr. Eshete received the highest interview scores of the candidates the search committee considered, and Mr. Eshete received the second highest score on his reference check. (*Id.* at ¶51.) Accordingly, at 4:48 p.m. on September 16, 2019, the committee informed Ms. McMullin that it was recommending that DePaul hire Mr. Eshete to serve as the night circulation supervisor. (*Id.* at ¶13.)

Each member of the search committee knew that (i) Mr. Eshete had had attendance issues, and (ii) Mr. Eshete's attendance issues were caused by illness. (*Id.* at ¶¶63, 79.) Indeed, Mr. Eshete was asked about his prior attendance issues during his interview. (*Id.* at ¶52.) But despite being well advised about Mr. Eshete's prior attendance issues, each member of the search committee recommended that DePaul rehire Mr. Eshete. (*Id.* at ¶18.) Moreover, Ms. McMullin knew about Mr. Eshete's prior attendance issues, and she could have taken Mr. Eshete out of contention to serve as the night circulation supervisor of her own accord. (*Id.* at ¶45.) Yet, despite everyone knowing about Mr. Eshete's previous attendance history, neither the search committee nor Ms. McMullin took Mr. Eshete out of contention to serve as the night circulation supervisor. (*Id.* at ¶¶63, 79.) Instead, the search committee recommended that DePaul rehire him. (*Id.* at ¶18.)

### 2. Ms. Kotoklo's career at DePaul is cut short.

Other than the case of Mr. Eshete, none of Ms. Kotoklo, Ms. McMullin, Mr. Eastham, or Mr. Karpinski could recall an occasion where a search committee's unanimous hiring recommendation had been rejected. (*Id.* at ¶54.) Nevertheless, on the morning of September 17, 2019, Mr.

---

ence for Mr. Eshete, she checked with DePaul's human resources office to determine whether she was permitted to serve as a reference given that she was also chairing the search committee. (*Id.* at ¶48.) Human resources did not object to Ms. Kotoklo serving as a reference. (*Id.* at ¶49.) And Mr. Karpinski—although he testified that he believes that Ms. Kotoklo and Mr. Eastham should not have served as references—could articulate no policy prohibiting Ms. Kotoklo or Mr. Eastham from serving as references while also serving on a search committee. (*Id.* at ¶50.)

Karpinski and Ms. McMullin met with the search committee, and the committee confirmed that Mr. Eshete was its choice to serve as the night circulation supervisor. (*Id.* at ¶¶18–19, 75.) And this Court knows the rest—Mr. Karpinski (i) rejected the committee's recommendation that it hire Mr. Eshete, and (ii) fired Ms. Kotoklo in retaliation for her refusal to take a black immigrant out of contention.

**C.  No rational jury could believe Mr. Karpinski's putative reasons for terminating Ms. Kotoklo's employment.**

Mr. Karpinski's putative reasons for terminating Ms. Kotoklo's employment were that (i) he (allegedly) lacked confidence in her ability to do her job, (ii) she was alleged dishonest when she did not voluntarily disclose that she had previously placed Mr. Eshete on progressive discipline. (*Id.* at ¶56.) But these putative reasons are really a smokescreen for discrimination and retaliation. How do we know? Most importantly, we know that Mr. Karpinski decided to terminate Ms. Kotoklo immediately after the search committee affirmed its recommendation that DePaul hire a black immigrant because this is what Mr. Karpinski said in his deposition. (*Id.* at ¶21.) But there are *at least* five other reasons that demonstrate that Mr. Karpinski's termination of Ms. Kotoklo was a smokescreen:

First, although DePaul has a robust progressive discipline policy, Ms. Kotoklo was not on progressive discipline when Mr. Karpinski abruptly fired her. (*Id.* at ¶¶57, 58.) As Ms. Kotoklo was previously told, DePaul does not cavalierly terminate long–time productive employees. (*Id.* at ¶59.) Why, then, did Mr. Karpinski terminate Ms. Kotoklo without at least attempting the progressive discipline process? Ms. Kotoklo has never received an answer to this question.

Second, there are (at least) four problems with Mr. Karpinski's complaint that Ms. Kotoklo failed to disclose the fact that Mr. Eshete was on progressive discipline: (i) there is no policy requir-

ing Ms. Kotoklo to have disclosed that Mr. Eshete was on progressive discipline (*id.* at ¶61), (ii) Mr. Karpinski was actually aware of the issues leading Mr. Eshete to have received progressive discipline even if he was not aware of the progressive discipline itself (*id.* at ¶62), (iii) the entirety of the search committee was aware of Mr. Eshete's prior attendance issues (*id.* at ¶63), and (iv) although Mr. Eshete was on progressive discipline in 2017, DePaul's own progressive discipline policy offers a clean slate after a year (*id.* at ¶64). Thus, under DePaul's own policy, the mere existence of progressive discipline in 2017 should not have been held against Mr. Eshete in 2019.[3]

Third, it is anticipated that DePaul and Mr. Karpinski will point to the fact that many staff members allegedly objected to the hire of Mr. Eshete. (*Id.* at ¶67.) But this anticipated argument would also come with bad grace. Why? Because according to Ms. McMullin, staff objected to Mr. Eshete's hire because of his attendance issues. (*Id.*) However, both Ms. McMullin and Mr. Karpinski knew that Mr. Eshete's attendance issues were due to health conditions. (*Id.* at ¶68.) Thus, both Ms. McMullin and Mr. Karpinski knew that Mr. Eshete's absence issues were unlikely to reoccur. But, rather than tell the staff that Mr. Eshete was no longer an attendance risk (*id.* at ¶69), Mr. Karpinski decided to continue to block Mr. Eshete's path to employment. Moreover, neither Mr. Karpinski nor Ms. McMullin *ever* shared the (alleged) concerns that the staff had about Mr. Eshete's with members of the search committee. (*Id.* at ¶70.) But if negative staff reac-

---

[3]      Mr. Karpinski's complaint that Ms. Kotoklo failed to disclose that she had previously placed Mr. Eshete on progressive discipline also has a whiff of hypocrisy. Why? Because Mr. Karpinski failed to disclose to human resources that he decided to terminate Ms. Kotoklo mere hours after she confirmed her recommendation that DePaul hire a black immigrant. (*Id.* at ¶66.) He also failed to disclose that Ms. Kotoklo raised the issue as to whether race or national origin affected Mr. Karpinski's decision to refuse to hire Mr. Eshete. (*Id.* at ¶¶75, 77.) If Ms. Kotoklo was dishonest for failing to disclose that she had issued progressive discipline (but not the facts leading to the progressive discipline), then Mr. Karpinski was also dishonest for failing to disclose information as to (i) when and why he wanted to terminate Ms. Kotoklo, and (ii) Ms. Kotoklo's suggestion that racial animus was at play.

tion were a reason for refusing to hire Mr. Eshete, why not share that (allegedly critical) information with the rest of the search committee right away?

Fourth, the undisputed facts demonstrate that neither attendance issues nor poor performance are dealbreakers for promotion or transfer within DePaul's library. How do we know? Because a white student-employee with a history of attendance issues was encouraged to apply to serve as the night circulation supervisor. (*Id.* at ¶71.) Moreover, a white employee with a history of poor performance was permitted to transfer freely within the library without any administrative interference from Mr. Karpinski or anyone else. (*Id.* at ¶72.)

Fifth, it is not against DePaul's policies to interview only one person—as opposed to the top three candidates—for a position. How do we know? Because Mr. Karpinski elevated Ms. McMullin from the position of assessment and marketing librarian to the position of associate university librarian after interviewing only her. (*Id.* at ¶¶73-74.) If it is appropriate for Mr. Karpinski to interview only one white candidate when hiring for the senior position of associate university librarian (*i.e.*, a position two levels above the night circulation supervisor position), why is it inappropriate for a three-person search committee to interview only one black immigrant candidate for the (very) junior night circulation supervisor position?

### Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A motion for "summary judgment is the 'put up or shut up' moment in a lawsuit" when the nonmoving party must show its evidence and demonstrate that there is a dispute that can only be resolved at trial. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003). Summary judgment is appropriate in cases, such as this one, "[w]here the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party [and, therefore,] there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) *citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 586–87 (1986).

<u>Argument</u>

A plaintiff–employee "may establish a *prima facie* case by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that is more likely than not that such actions were based on a discriminatory criterion[.]" *Young v. UPS, Inc.*, 135 S. Ct. 1338, 1354 (2015). Here, the undisputed facts show that DePaul–by and through its agent, Robert Karpinski–violated its own policies and subjected Ms. Kotoklo and Mr. Eshete to different standards than its white and non–African employees. And despite having many opportunities to explain themselves and their actions, both DePaul and Mr. Karpinski have failed to do so. Thus, there is only one conclusion to be drawn: Mr. Karpinski's and DePaul's actions were due to racial and retaliatory animus.

**A.    DePaul retaliated against Ms. Kotoklo in violation of the federal civil rights laws.**

A plaintiff may prove retaliation under Title VII or 42 U.S.C. §1981 by showing (1) she engaged in protected activity, (2) a materially adverse action taken by her employer, and (3) a causal connection between the two. *Humphries v. COBCS West, Inc.*, 474 F. 3d 387, 404 (7th Cir. 2007).[4]

There is no legitimate dispute that it violates (i) Title VII to refuse to hire someone due to their race or national origin, and (ii) 42 U.S.C. §1981 to refuse to hire someone based on their race. Nor is there any legitimate dispute that terminating Ms. Kotoklo's employment was an ad-

---

[4]        A plaintiff may also prove retaliation under the indirect method. *See Tomanovich v. City of Indianapolis*, 457 F. 3d 656, 663 (7th Cir. 2006) (explaining indirect method of proving retaliation). In the event that this matter proceeds to trial, Ms. Kotoklo reserves the right to proceed under the direct or the indirect method; however, for purposes of summary judgment, she elects to proceed only under the direct method.

verse employment action. *E.g., Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). The only question, therefore, is whether Ms. Kotoklo's termination was based on her refusal to take Mr. Eshete out of consideration for employment based on his race or his national origin. The answer to this third question is an unequivocal "yes."

> **1.  Mr. Karpinski admitted that he terminated Ms. Kotoklo because she refused to take Mr. Eshete out of contention for a job.**

Immediately after Ms. Kotoklo affirmed that she wanted to hire a black immigrant, Mr. Karpinski decided he was going to fire her. Thus, the timing of Ms. Kotoklo's termination was more than merely suspicious. *See, e.g., Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) ("circumstantial evidence of intentional retaliation include[es] evidence of suspicious timing . . . [and] behavior towards or comments directed at other employees in the protected group"). Here, there was absolutely *nothing* between Ms. Kotoklo's affirmation of her recommendation that DePaul hire a black immigrant and Mr. Karpinski's decision to terminate Ms. Kotoklo's employment. If this does not demonstrate a causal connection, what does?

Throughout the search process, Ms. Kotoklo complied with both the letter and the spirit of every policy in connection with the potential hire of the night circulation supervisor position: she (i) worked with her search committee to identify acceptable candidates, (ii) asked human resources whether it was acceptable to interview only one candidate, (iii) complied with Mr. Karpinski's instruction that the search committee interview the top three candidates, (iv) explained Mr. Eshete's prior attendance issues to Mr. Karpinski and Ms. McMullin, and (v) obtained permission to serve as a reference for Mr. Eshete while also serving as a member of the search committee. Ms. Kotoklo also acknowledged that Mr. Karpinski had the final say on the decision to hire Mr. Eshete. In other words, the only conduct that could possibly be labeled as defiant was Ms. Kotoklo's refusal to be

the person to take a black immigrant out of contention for a job for which she felt he was quali-
fied.

2.    **Mr. Karpinski could not have believed it was dishonest for Ms. Kotoklo to fail to disclose Mr. Eshete's progressive discipline because Mr. Karpinski failed to disclose much more important information to human resources.**

Notwithstanding that Mr. Karpinski and Ms. McMullin knew that Mr. Eshete had prior at-
tendance issues, Mr. Karpinski was adamant that Ms. Kotoklo should have disclosed that Mr.
Eshete had received progressive discipline. But sauce for the goose is sauce for the gander: *if* Mr.
Karpinski legitimately believed that Mr. Eshete's receipt of progressive discipline was relevant to
the hiring decision (even though he knew about the conduct that caused Mr. Eshete to receive
progressive discipline), and *if* it was dishonest for Ms. Kotoklo not to volunteer that she had placed
Mr. Eshete on progressive discipline, why isn't it also dishonest for Mr. Karpinski to fail to disclose
critical information to human resources concerning the more serious decision to terminate?

Ms. Kotoklo put the foregoing question to Mr. Karpinski during his deposition. But of-
fered a chance to explain his (hypocritical) conduct, Mr. Karpinski refused to do so. Why? Because
Mr. Karpinski does not honestly believe Ms. Kotoklo was dishonest. *See Castro v. DeVry Univ.*, 786
F.3d 559, 565 (7th Cir. 2015) ("weaknesses, implausibilities, inconsistencies, or contradictions" in
proffered reason for employment action are evidence of pretext). *See also Hitchcock v. Angel Corps,
Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment as jury could "find the ex-
planation [for the termination] to be so ludicrous that [the employer] is not to be believed");
*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir.2011) ("[t]he Civil Rights Act of 1964
does not require employers to have 'just cause' for sacking a worker, but an employer who advanc-
es a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pre-
text for discrimination"). Thus, the Court should see Mr. Karpinski's accusation of dishonesty by

11

Ms. Kotoklo for what it is—a smokescreen so that he could terminate her for refusing to take a black immigrant out of contention for a job for which that black immigrant was qualified.

3. **Mr. Karpinski elevated Ms. McMullin to the position of associate university librarian without conducting a search, but refused to permit the search committee to make a recommendation after interviewing only Mr. Eshete.**

Mr. Karpinski insisted that the search committee interview the top three candidates to serve as the night circulation supervisor. Why? According to Mr. Karpinski it was to protect the integrity of the process. Yet Mr. Karpinski had no concerns for the so-called integrity of the process when he wanted to hire Ms. McMullin into the more senior position of associate university librarian. Once again, sauce for the goose is sauce for the gander. *Castro v. DeVry Univ.*, 786 F.3d at 565. *If* Mr. Karpinski legitimately believed that the integrity of the process required the search committee for a junior position to identify and interview multiple people, *then* he should have identified and interviewed multiple people before promoting a white woman into a senior position. (*See id.*) That Mr. Karpinski refused to follow his own rules suggests that his concerns about Mr. Eshete's application were not about the integrity of the process but about the desire to thwart black immigrants.

4. **Mr. Karpinski is very angry that Ms. Kotoklo refused to do his dirty work.**

Mr. Karpinski suggested that the hire of Mr. Eshete would have been an existential threat to the Access Services department based on prior allegations of favoritism. But how does he attempt to prevent this alleged threat from manifesting? Does he tell the staff why Mr. Eshete had had attendance issues, or that those issues are unlikely to reoccur? No. Does he tell the members of the search committee that there is (allegedly) universal resistance to the rehire of Mr. Eshete? No. Does he tell Ms. McMullin to take Mr. Eshete out of consideration for the night circulation supervisor position following her interviews of the candidates? No. What does he do? He tells Ms. Ko-

tokolo that Mr. Eshete had prior attendance problems (*i.e.*, he gives her information that she already has), and he expects Ms. Kotoklo to take a hint. When Ms. Kotoklo refuses, he fires her.

Once again, "weaknesses, implausibilities, inconsistencies, or contradictions" in the proffered reason for an employment action is evidence of discrimination. *Castro*, 786 F.3d at 565. Here, it is inexplicable that a seasoned administrator would hide (allegedly critical) information from (i) his search committee, or (ii) the rest of the Access Services staff. Thus, there is only one inference to be drawn–Mr. Karpinski's decision to reject the search committee's recommendation that DePaul hire Mr. Eshete was not for legitimate business reasons, but because he did not want another black immigrant in the library.

### 5. DePaul failed to follow its own progressive discipline policies.

Ms. Kotoklo was a long-term employee of DePaul University with no record of any progressive discipline. Thus, according to DePaul's own policies, she should have at least been placed on a performance improvement plan or given written counseling before she was unceremoniously terminated. An employer's failure to follow its own policies is evidence of discrimination. *Joll v. Valpariso Community Schools*, 953 F.3d 923, 931 (7th Cir. 2020) ("deviation from standard procedures" is evidence of pretext); *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (extraordinary departure from established policy evidence of discrimination); *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012) (selective enforcement of company policy can establish pretext). Given Mr. Karpinski's refusal to explain himself, Ms. Kotoklo must (and this Court should) fall back on Occom's Razor–Mr. Karpinski refused to follow DePaul's policies because he did not want to retain an employee who refused to follow his wishes and violate the civil rights laws.

### 6. Mr. Karpinski still has not explained why he rejected the unanimous opinion of the search committee.

For the first time in institutional memory, DePaul's library disregarded the unanimous opinion of a search committee on a hiring recommendation. Having been given an opportunity to explain his reasons for disregarding the search committee's recommendation, Mr. Karpinski could not articulate a legitimate one. This failure to follow established custom also demonstrates that (i) Mr. Karpinski did not want to hire Mr. Eshete for racially discriminatory reasons, and (ii) when Ms. Kotoklo refused to serve as the instrument of Mr. Karpinski's animus, he decided to fire her, too. *See, e.g., Joll*, 953 F.3d at 931 ("deviation from standard procedures" evidence of pretext).

**B.     Defendants retaliated against Ms. Kotoklo in violation of the Illinois Whistleblower Act.**

A plaintiff may prove a violation of the Illinois Whistleblower Act by establishing that "(1) she refused to participate in an activity that would result in a violation of . . . federal law. . . and (2) her employer retaliated against her because of the refusal." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶48. Here, there is no legitimate dispute that it violates federal law to refuse to hire someone due to their race or national origin. The only question, therefore, is whether Mr. Karpinski terminated Ms. Kotoklo because she refused to take Mr. Eshete out of contention for a job. As discussed *supra* pages 9–14, the answer is "yes."

<u>Conclusion</u>

Mr. Karpinski acknowledged that we would not be here if Ms. Kotoklo had simply refrained from recommending that DePaul hire Mr. Eshete. But there were no legitimate reasons for refusing to hire Mr. Eshete—everyone knew that Mr. Eshete had had attendance issues in the past, and everyone knew that these attendance issues were unlikely to be repeated. Mr. Eshete also had the unanimous recommendation of the search committee. What more would Mr. Karpinski have needed to hear to hire Mr. Eshete or to believe Ms. Kotoklo's handling of the hiring process was proper? Given the opportunity to explain himself, Mr. Karpinski has refused to do so. Why? Be-

14

cause the truth is ugly: Mr. Karpinski makes employment decisions based alternatively on the employee's race or on the employee's national origin.

This case presents, for the first time in institutional memory, the rejection of the unanimous hiring recommendation of a search committee in DePaul's library. It also presents a senior administrator who makes up rules for his subordinates (*e.g.*, that Ms. Kotoklo's search committee interview multiple people for the night circulation supervisor position), but who refuses to follow those same rules when they inconvenience him (*e.g.*, Mr. Karpinski hired a white woman into the more senior AUL position without a robust interview process). And we have a long–time employee who was fired without any progressive discipline. On the undisputed record, it does not take any significant mental leap to see what occurred: Mr. Karpinski was livid that Ms. Kotoklo (a black immigrant) had the temerity to persist in recommending that DePaul hire another black immigrant (Mr. Eshete), so he terminated her employment.

Having had the opportunity to explain himself and his actions, Mr. Karpinski either could not or would not. Thus, there is no need for a trial on the question of liability for Mr. Karpinski's (and, by extension, DePaul's) retaliation. What is left to decide (at least with respect to retaliation) are the damages that Ms. Kotoklo suffered, including the wages and tuition waivers that she lost, the anger and humiliation she suffered, and the punitive damages that Mr. Karpinski ought to pay for his malicious assault on Ms. Kotoklo's dignity.

Respectfully submitted,
February 22, 2021

*/s/ Fitzgerald T. Bramwell*
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
255 West Washington, Suite 2200
Chicago, Illinois 60606
312–924–2884 (voice)
bramwell@fitzgeraldbramwell.com

**Certificate of Service**

The undersigned, an attorney, certifies that on February 22, 2021, he caused the foregoing Memorandum of Law In Support of Mireille Kotoklo's Motion For Summary Judgment to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Katherine A. Manuel, Esq.
Joseph T. Charron, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60606
katherine.manuel@ogletree.com
joseph.charron@ogletreedeakins.com
*Counsel for defendants*

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
255 West Washington, Suite 2200
Chicago, Illinois 60606
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com