# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
### (EASTERN DIVISION)

| | | |
|---|---|---|
| Mireille Kotoklo | ) | |
|     Plaintiff, | ) | Hon. Joan B. Gottschall |
| v. | ) | |
| | ) | Magistrate Judge M. David Weisman |
| Robert Karpinski and DePaul University | ) | |
|     Defendants. | ) | No. 20–cv–635 |
| _____ | ) | |

**Mireille Kotoklo's Response and Objection To Defendants' Motion For Summary Judgment**

Mireille Kotoklo ("Ms. Kotoklo") responds to Robert Karpinski ("Mr. Karpinski") and De-Paul University's ("DePaul") Motion For Summary Judgment, filed at Docket No. 60, as follows:

## Executive Summary

Stripped of rhetoric, the defendants' motion for summary judgment rests on a flawed premise: "Defendants [allegedly] spent six and a half months coaching and counseling [Ms. Kotoklo] on professional management practices," following "numerous, consistent complaints from employees that [Ms. Kotoklo] created a dysfunctional and hostile work environment in her department." (Br. at page 1.)[1] And according to the defendants, Ms. Kotoklo was not "receptive to [their] counseling efforts," and she allegedly refused to "accept constructive criticism" or "to take any steps in response to this feedback." (Br. at pages 1–2.) Thus, the defendants ignore and distort the record.

As an initial matter, the record contains no admissible evidence that Ms. Kotoklo created a "dysfunctional and hostile work environment." (*See* Br. at page 1.) Rather, the facts show that Ms. Kotoklo's nearly two decade tenure at DePaul was sterling until Mr. Karpinski became head of the

---

[1]     Ms. Kotoklo cites the Defendants' Memorandum of Law In Support of Their Motion For Summary Judgment, filed at Docket No. 61, as "Br.__." She cites to her Response To Defendants' Statement of Material Facts as "D. SOF __" and to her Statement of Additional Material Facts Pursuant To Local Rule 56.1(b)(3) as "P. SOF __."

library. (P.SOF at ¶¶1, 3.) Indeed, according to a chart prepared by Sarah Frost—an internal executive coach who testified as a Rule 30(b)(6) representative—the members of Ms. Kotoklo's former department acknowledged lots of positives within the unit that she led. (*Id.* at ¶¶10–12.) Finally, the record reveals that Ms. Kotoklo was ready, willing, and able to do whatever she had to do to implement her supervisors' agenda. (*Id.* at ¶¶2–3, 10, 12) So why are we here? As discussed both *infra* and in Ms. Kotoklo's own summary judgment papers (*see* Docket Nos. 55, 57, 59), no black immigrant was ever going to get a fair shake with Mr. Karpinski at the helm. This is why he refused to re-hire Dilnesa Eshete and this is why he fired Ms. Kotoklo.

## Facts

Ms. Kotoklo incorporates her contemporaneously filed Response To Defendants' Statement of Material Fact Pursuant To Local Rule 56.1(b)(2) and Statement of Additional Material Facts Pursuant To Local Rule 56.1(b)(3) as if set forth fully herein.

## Standard of Review

Summary judgment is appropriate *only* if the facts show that there are no genuine issues for trial and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. In making this determination, the Court reviews all of the evidence in the light most favorable to the non-moving party. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 762 (7th Cir. 2016) (reversing district court's grant of summary judgment). In considering a motion for summary judgment, the Court's must resist the temptation to act as a juror or to weigh the evidence. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (reversing motion for summary judgment). Rather, the Court's role is to determine whether there are disputes that require a trial to resolve. *See id.*

**Argument**

The law trusts a great deal to the jury's lived human experience, and it generally seeks to preserve a plaintiff's right to "the commonsense judgment of [her] community." *Joll v. Valparasio Community Schools*, 953 F.3d. 923, 928 (7th Cir. 2020) (bracket in the original). Courts permit juries "to infer a great deal without mathematical precision" recognizing that "trials are stories, not syllogisms." *Id.* Therefore, in evaluating a motion for summary judgment, "the court must try to focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Id.* In this case, Ms. Kotoklo's story is so compelling that she took the unusual step of filing her own motion for summary judgment on the question of retaliation. (*See* Docket Nos. 55, 59.) But the story is equally compelling with respect to discrimination. Ms. Kotoklo starts her story in the middle, with Mr. Karpinski's knee-jerk rejection of Mr. Eshete's application for re-employment.

With respect to Mr. Karpinski's consideration of Mr. Eshete's application, Mr. Karpinski canceled Mr. Eshete's scheduled interview and set a meeting with Ms. Kotoklo to discuss Mr. Eshete's prior attendance problems. (P.SOF at ¶¶15–18.) At that meeting, Ms. Kotoklo told Mr. Karpinski that Mr. Eshete had been sick and that his sickness was why he had had attendance issues towards the end of his first tour of duty with DePaul. (*Id.* at ¶18.) The search committee also knew that Mr. Eshete's prior attendance issues were due to sickness, and so did Ashley McMullin. (*Id.* at ¶¶23, 25.) But the search committee subsequently satisfied itself that Mr. Eshete's attendance issues were unlikely to reoccur as evidenced by its unanimous recommendation that DePaul rehire Mr. Eshete. (*Id. at* ¶¶23–25.) Ms. McMullin also interviewed Mr. Eshete and did not pull the plug on his application for re-employment with DePaul. (*Id.* at ¶21.)

Notwithstanding all of the vetting that Mr. Eshete received (*see id.* at ¶¶13-15, 18, 20–25, 30), Mr. Karpinski rejected (for the first time in institutional memory) the search committee's unanimous recommendation (*id.* at ¶25, 28), telling Ms. Kotoklo that Mr. Eshete should have received only a "courtesy interview" (*id.* at ¶24). What does this demonstrate? Not just "baseline resistance" to Mr. Eshete's candidacy, but an *ab into* rejection of it. *Cf. Joll*, 953 F.3d at 930. On what is this resistance based? Occom's Razor suggests race and/or national origin. Why? Compare Mr. Karpinski's treatment of Mr. Eshete with his treatment of Ms. Kotoklo, the other black immigrant in his orbit.

With respect to Mr. Karpinski's treatment of Ms. Kotoklo, the undisputed facts demonstrate the following: (1) Ms. Kotoklo had served for nearly nineteen years without blemish until Mr. Karpinski took over the library (P.SOF at ¶¶1, 3), (2) Mr. Karpinski was quick to blame Ms. Kotoklo for being a source of disfunction in the library, but took forty days to provide specific examples so that she could attempt to correct any issues raised (*id.* at ¶¶4–7), (3) when Mr. Karpinski directed Ms. Kotoklo to Ms. Frost, Ms. Frost reported that Ms. Kotoklo took seriously the coaching she received (*id.* at ¶¶10–11), and (4) Mr. Karpinski acknowledged that Ms. Kotoklo's performance improved following her executive coaching session (*id.* at ¶10). The record further reveals that Ms. Kotoklo received no progressive discipline even though DePaul does not typically terminate long-term productive staff like Ms. Kotoklo without following its progressive discipline policy. (*Id.* at ¶¶32–35.) In short, Mr. Karpinski was papering the file, not attempting to help Ms. Kotoklo improve her (allegedly poor) performance. Ultimately, Ms. Kotoklo had just as much opportunity to succeed under Mr. Karpinski's leadership as Mr. Eshete had opportunity to obtain re-employment under Mr. Karpinski. In other words, she had none.

In case that there was any doubt that Mr. Karpinski linked Ms. Kotoklo's termination with her recommendation on Mr. Eshete's application, these three additional facts would lay it to rest. First, Mr. Karpinski decided to terminate Ms. Kotoklo within hours of her recommendation that DePaul rehire Mr. Eshete; however, he did not discipline any other member of the search committee and he did not discipline Ms. McMullin. (*Id.* at ¶¶21, 25.) Second, at the October termination meeting, Mr. Karpinski made it a point to ask Ms. Kotoklo why she insisted on hiring Mr. Eshete. (*Id.* at ¶37.) Third, Mr. Karpinski told Ms. Kotoklo that Mr. Eshete should have received only a courtesy interview as opposed to legitimate consideration for the job. (*Id.* at ¶24.)

Finally, an extraordinary deviation from established procedure is evidence of discrimination. *Joll*, 953 F.3d at 931. *See also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013). In this case, Mr. Karpinski thrice deviated from established procedure to keep Mr. Eshete out of his library and to fire Ms. Kotoklo. First, Mr. Karpinski ordered the search committee—which had already received permission to interview only Mr. Eshete—to identify and interview three candidates for the night circulation supervisor position. (*Id.* at ¶15.) Mr. Karpinski, however, was happy to interview only one white candidate for the associate university librarian position. (*Id.* at ¶¶2, 31.) Second, for the first time in institutional memory, Mr. Karpinski ignored the unanimous recommendation of a search committee. (*Id.* at ¶28.) Third, Mr. Karpinski refused to provide *any* progressive discipline to Ms. Kotoklo despite DePaul's clear policies on this issue. (*Id.* at ¶¶32–34.)

Notwithstanding all of the foregoing, the defendants suggest that this Court would be sitting as a "superpersonnel department" if it examined Mr. Karpinski's motives in rejecting Mr. Eshete's application and in terminating Ms. Kotoklo's employment. (Br. at pages 11, 13.) But that is not so. Ms. Kotoklo is simply asking the Court to examine the record evidence to determine whether *a jury*

could find Mr. Karpinski's conduct consistent with discrimination. *See Joll*, 953 F.3d at 929–30 ("[e]mployers long ago taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written"). *See also Ortiz*, 834 F.3d at 765 (recognizing that few employers admit firing someone because of race). This is what courts are supposed to do when evaluating a summary judgment motion; such work does not turn the Court into a "superpersonnel department."

### A.     Ms. Kotoklo has stated a claim for retaliation.

A plaintiff may prove retaliation by showing (1) she engaged in protected activity, (2) a materially adverse action taken by her employer, and (3) a causal connection between the two. *Humphries v. COBCS West, Inc.*, 474 F. 3d 387, 404 (7th Cir. 2007). In this case, there is no legitimate dispute that the termination of Ms. Kotoklo's employment was a materially adverse action. *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). Rather, the defendants claim that (i) Ms. Kotoklo did not engage in protected activity, and (ii) there was no causal connection between Ms. Kotoklo's protected activity and the termination of her employment. The defendants are wrong.

### 1.     Refusal to violate the civil rights laws is protected activity.

By Title VII's plain language, it is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. §2000e–3. Similarly, the Seventh Circuit has held that "a plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981." *Humphries*, 474 F. 3d at 403. What is the unlawful employment practice that Ms. Kotoklo opposed? DePaul's and Mr. Karpinski's refusal to hire Mr. Eshete because he is a black immigrant in violation of the aforementioned civil rights laws.

6

Notwithstanding the foregoing, the defendants argue that Mr. Karpinski never actually told Ms. Kotoklo to take Mr. Eshete out of contention for a job. (Br. at page 7.) Therefore, according to the defendants, Ms. Kotoklo cannot claim "that she refused any instruction, much less an unlawful one." (*Id.*) But such argument tortures the record beyond recognition. On September 19, Ms. Kotoklo confirmed that she believed Mr. Karpinski did not want to hire Mr. Eshete because Mr. Eshete was a black immigrant (D.SOF at ¶67), an accusation that Mr. Karpinski has never denied. But in case there was any doubt, Mr. Karpinski confirmed that he was terminating Ms. Kotoklo because Ms. Kotoklo allegedly "insisted" on hiring Mr. Eshete (P.SOF at ¶37), even though Ms. Kotoklo had previously acknowledged that the final hiring choice belonged to Mr. Karpinski (D.SOF at ¶67). Thus, the causal connection is clear.

2.      **Mr. Karpinski fired Ms. Kotklo for refusing to take Mr. Eshete out of contention for a job.**

Why was Mr. Karpinski so adamant that DePaul not rehire Mr. Eshete? Mr. Karpinski claims that all of the staff complained that Mr. Eshete was late and unreliable. (*Cf.* D.SOF at ¶58.) Setting aside for the moment that the only evidence of these alleged complaints is hearsay (*see infra* pages 14–15), Ms. Kotoklo told Mr. Karpinski that Mr. Eshete's prior attendance problems were due to sickness and not for want of diligence.[2] (P.SOF at ¶18.) Did Mr. Karpinski tell the staff—who were allegedly objecting to Mr. Eshete's return—that Mr. Eshete's attendance issues were unlikely to be repeated or that his absences were for good reason? No. (*Id.* at ¶19.) Moreover, Ms. McMullin did not object to Mr. Eshete's rehire as evidenced by the fact that she did not try to pull the plug on his application. (*Id.* at ¶21.) Finally, staff did not complain to members of the search committee about

---

[2]      It is anticipated that Mr. Karpinski will reply that he did not know Mr. Eshete had cancer. But this reply would be a red–herring. What matters is that Mr. Karpinski knew that Mr. Eshete was sick and that this was the cause of his prior attendance problems.

Mr. Eshete's application. (*Id.* at ¶30.) But if Mr. Karpinski was correct that staff universally objected to Mr. Eshete, why didn't any staff approach the search committee? Further, why did Mr. Karpinski say that Mr. Eshete should have received only a courtesy interview despite the extensive vetting by his search committee? (*Id.* at ¶24.) On these facts, Occom's Razor suggests Mr. Karpinski simply did not want another black immigrant in his library.

Immediately after Ms. Kotoklo affirmed her recommendation that DePaul re-hire a black immigrant, Mr. Karpinski decided he was going to fire her. (P.SOF at ¶36.) Thus, the timing of Ms. Kotoklo's termination was more than merely suspicious. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) ("circumstantial evidence of intentional retaliation include[es] evidence of suspicious timing . . . [and] behavior towards or comments directed at other employees in the protected group"). The Seventh Circuit has explained that a one-day delay between protected activity and a decision to terminate can raise an interference of causation. *Pantoja v. American NTN Bearing Mfg. Co.*, 495 F.3d 840, 850 (7th Cir. 2007) (reversing summary judgment). Here, the delay between Ms. Kotoklo's protected activity and the decision to terminate was mere hours. (P.SOF at ¶36.) And in case there was any doubt as to the connection between Ms. Kotoklo's recommendation that DePaul hire Mr. Eshete and Mr. Karpinski's decision to terminate Ms. Kotoklo, Mr. Karpinski removed it during the October 3 termination meeting when he asked Ms. Kotoklo why she insisted on hiring Mr. Eshete. (*Id.* at ¶37.)

**B.      Ms. Kotoklo has stated a claim for violation of the Illinois Whistleblower Act.**

A plaintiff may prove a violation of the Illinois Whistleblower Act by establishing that "(1) she refused to participate in an activity that would result in a violation of . . . federal law. . . and (2) her employer retaliated against her because of the refusal." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶48. Here, the Defendants argue that Ms. Kotoklo has failed to state a

8

claim because she did not refuse to do anything. (Br. at page 15.) Thus, the Defendants continue to ignore and to distort the record, which demonstrates that Ms. Kotoklo refused to take Mr. Eshete—a black immigrant—out of contention for a job for which he was qualified. How do we know? Because Mr. Karpinski said so on October 3, 2019. (P.SOF at ¶37.)

**C.    Ms. Kotoklo has stated a claim for discrimination.**

Title VII prohibits discrimination in employment on the basis of race and national origin, and the Civil Rights Act of 1866 (as modified by the Civil Rights Act of 1991) prohibits discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. §1981. *See also Ortiz,* 834 F.3d at 765. In this case, as in nearly every case of discrimination, "'the sole question that matters' is causation: whether a statutorily proscribed factor caused [the termination]." *Joll,* 953 F.3d at 929 *citing Ortiz,* 834 F.3d at 764–65.

A plaintiff need not use the *McDonnell Douglas* burden–shifting test to prove her case. *See Joll,* 953 F.3d at 929. Instead, she may present her case by demonstrating dishonest employer justifications for the adverse job action, better treatment of people similarly situated but for the protected characteristic, or mistreatment of others with the protected characteristic. *Id.*[3] *See also Castro v. DeVry Univ.,* 786 F.3d 559, 565 (7th Cir. 2015) ("weaknesses, implausibilities, inconsistencies, or contradictions" in proffered reason is evidence of pretext); *Hitchcock v. Angel Corps, Inc.,* 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment as jury could find explanation for termination "to be so ludicrous that [the employer] is not to be believed"); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d

---

[3]    The *McDonnell Douglas* test requires a plaintiff to demonstrate that (1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual was treated more favorably. The burden then shifts to the employer to articulate a legitimate non–discriminatory reason for its action. If the employer makes this showing, the plaintiff must demonstrate that the stated reason is pretextual. *See Coleman,* 667 F.3d at 845.

312, 315 (7th Cir.2011) ("an employer who advances a fishy reason [for termination] takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination"); *Boume-hdi*, 489 F.3d at 792 (mistreatment of others in the protected class evidence of animus). A plaintiff may also make her case using only circumstantial evidence. *See Joll*, 953 F.3d at 929–30.

**1.     Mr. Karpinski's conduct was consistent with someone who is papering the file and not with someone who honestly believed Ms. Kotoklo had performance problems.**

The chronology of Mr. Karpinski's so-called "coaching and counseling" efforts (*cf.* Br. at page 1) is consistent with someone looking to paper the file as opposed to helping an allegedly poorly performing employee. Mr. Karpinski's first alleged attempt to coach Ms. Kotoklo occurred on March 21 when he presented Ms. Kotoklo with a laundry list of alleged performance concerns. (P.SOF at ¶4.) When Ms. Kotoklo asked for specifics about these alleged performance deficiencies, it took Mr. Karpinski forty days to provide them. (*Id.* at ¶¶5–7.) But when Ms. Kotoklo identified Mr. Karpinski's behavior for what it was—an attempt to paper the file—it took less than an hour for Mr. Karpinski to complain about Ms. Kotoklo to human resources. (*Id.* at ¶¶8–9.)

It is simply implausible that Mr. Karpinski would take (1) more than a month to provide an allegedly struggling employee with information, and (2) almost four months to connect that employee with an executive coach *unless* he was looking to paper the file. (*Id.* at ¶¶4–10.) Recall, again, that Mr. Karpinski was able to respond to Ms. Kotoklo's email accusing him of papering the file within an hour of receiving it. (*Id.* at ¶9.) As the Seventh Circuit has explained, implausible conduct and conduct inconsistent with its stated purpose is evidence of discrimination. *Castro*, 786 F.3d at 565. Moreover, the allegedly negative comments that Mr. Karpinski attributes to staff are not consistent with the staff feedback from the teambuilding session led by Ms. Frost, which further suggests Mr. Karpinski was papering the file. (P.SOF at ¶11.)

With respect to the executive coaching/teambuilding facilitated by Ms. Frost, the undisputed record reveals that Ms. Kotoklo was an active participant in it and that the session went well. (*Id.* at ¶¶10–11.) The undisputed record also reveals that (1) Ms. Kotoklo's subordinates had a lot of positive things to say about Ms. Kotoklo's department, and (2) Ms. Kotoklo agreed to do whatever Mr. Karpinski or Ms. McMullin instructed when it came to interacting with her subordinates. (*Id.*) So how does Mr. Karpinski—with a straight face—claim that Ms. Kotoklo refused to accept coaching or counseling? It is anticipated that the Defendants will reply by continuing to complain that Ms. Kotoklo refused to come up with "goals" following her exercise with Ms. Frost. However, as Ms. McMullin acknowledged, it was management's job to tell Ms. Kotoklo what to do and to give Ms. Kotoklo "goals" to achieve. (*Id.* at ¶12.) The record is clear: Ms. Kotoklo was ready and willing to do whatever her supervisors told her to do, and she was making progress. (*Id.* at ¶¶10–12.)

In addition to the foregoing, Mr. Karpinski deviated significantly from established procedure in recommending Ms. Kotoklo for termination. How? There was no progressive discipline. (*Id.* at ¶32.) However, in the past thirteen years, DePaul has terminated only two staff members for performance reasons without going through its progressive discipline process. (*Id.* at ¶33.) When will DePaul forego its progressive discipline process for performance reasons? Only when a staff member is given extensive counseling, *and* there is no change in behavior, *and* there is conduct detrimental to the unit. (*Id.* at ¶34.) Here, Mr. Karpinski acknowledged that Ms. Kotoklo was improving her performance (*id.* at ¶10), and Ms. Kotoklo agreed to do whatever her supervisors instructed her to do (*id.* at ¶12). Why, then, did progressive discipline not issue? The Seventh Circuit permits an inference of discrimination on these facts. *Hobgood*, 731 F.3d at 645 (extraordinary departure from

11

established policy evidence of discrimination); *Coleman* 667 F.3d at 858 (selective enforcement of company policy can demonstrate pretext).

It is anticipated the Defendants will reply by continuing to argue that its progressive discipline policy gives it the right to begin at any process. While technically correct, this is not the manner in which DePaul has implemented that policy. (*See id.* at ¶¶32–34.) Thus, a jury could interpret this deviation from well–established practice as evidence of discrimination. *See Hobgood*, 731 F.3d at 645.

2.       **Mr. Karpinski afforded white Americans more leeway than black immigrants.**

The Defendants claim that Ms. Kotoklo's recommendation that DePaul re-hire Mr. Eshete was "dishonest and disingenuous." (Br. at page 2.) If that is true, then it was also dishonest and disingenuous for Mr. Karpinski to promote Ms. McMullin to associate university librarian without engaging a search committee or interviewing multiple candidates. Mr. Karpinski insisted that the search committee interview three candidates to serve as the night circulation supervisor, ostensibly to protect the integrity of the process. (*Id.* at ¶16.) However, Mr. Karpinski had no concerns for the so–called integrity of the process when he wanted to hire Ms. McMullin into the more senior position of associate university librarian. (*Id.* at ¶31.) But *if* Mr. Karpinski legitimately believed that the integrity of the hiring process required the search committee for a junior position to identify and interview multiple people, *then* he should have identified and interviewed three people before promoting a white woman into a senior position. *See Castro*, 786 F.3d at 565. That Mr. Karpinski failed to follow his own rules suggests that his concerns about Mr. Eshete's application were not about the integrity of the process but about his desire to thwart black immigrants. *See id.*

Mr. Karpinski also claims that he refused to hire Mr. Eshete due to staff objections to Mr. Eshete's prior attendance issues. (D.SOF at ¶58.) However, Mr. Karpinski knew Mr. Eshete's attendance issues were unlikely to be repeated, but refused to share that information with (allegedly

objecting) staff. (P.SOF at ¶¶18–19.) Nor did Mr. Karpinski share the staff's alleged concerns with other members of the search committee. (*Id.* at ¶19.) In other words, Mr. Karpinski's stated reason for refusing to hire Mr. Eshete was so incongruous—particularly given that Ms. McMullin also did not attempt to pull the plug on Mr. Eshete's hire—that it smacks of pretext.

> **3.** **Mr. Karpinski's animus against black immigrants is evident by his campaign against the two who entered his orbit.**

Mr. Karpinski does not like black immigrants. How do we know? Negative "behavior towards . . . other employees in the protected group" is evidence of it. *See Boumehdi*, 489 F.3d at 792. *See also Hasan v. Foley & Lardner LLP*, 552 F. 3d 520, 529 (7th Cir. 2008). Here, Mr. Karpinski (i) papered the file to attempt to justify terminating Ms. Kotoklo (P.SOF at ¶¶1–12), (ii) ignored the unanimous recommendation of a search committee (*id.* at ¶¶25, 28), (iii) refused to tell staff who allegedly objected to Mr. Eshete's re–hire that the attendance issues that plagued Mr. Eshete's prior employment were unlikely to be repeated (*id.* at ¶19), (iv) refused to tell the search committee about alleged staff complaints about Mr. Eshete's re–hire (*id.*), and (v) told Ms. Kotoklo that Mr. Eshete should have received only a courtesy interview as opposed to fair consideration for re–hire (*id.* at ¶24). Mr. Karpinski also terminated Ms. Kotoklo without progressive discipline even though she was remedying her alleged performance deficiencies. (*Id.* at ¶¶10, 32–34.) And Mr. Karpinski expressly mentioned Mr. Eshete when he terminated Ms. Kotoklo. (*Id.* at ¶37.) The total weight of these actions is so great that DePaul does not even try to address it.

Instead of addressing the foregoing, DePaul pivots and argues that Mr. Karpinski cannot be bigoted because he subsequently hired two black employees. (Br. at page 12.) There are two problems with this argument. First, Mr. Karpinski did not hire these two black employees until *after* he learned that Ms. Kotoklo filed a charge of discrimination that mentioned him. (P.SOF at ¶¶39–40, D.SOF

at ¶58.) Therefore, it is just as likely that Mr. Karpinski hired these two black individuals as a smokescreen. *See also Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (reversing summary judgment and explaining "Title VII would have little force if an employer could defeat a claim of discrimination by treating a single member of the protected class in accordance with the law"). Second, it does not appear that the black employees hired by Mr. Karpinski were immigrants.

**D.      There is no admissible evidence that staff lodged complaints about Ms. Kotoklo or Mr. Eshete.**

The defendants claim that staff lodged a laundry list of complaints against Ms. Kotoklo, including complaints by (i) anonymous staff in March 2019, and (ii) staff members April Hummons and Cary Cline after March 2019. (*See* D.SOF at ¶¶10–12, 15, 23–25.) The defendants also claim that nearly every member of the access services staff lodged a similar litany of complaints against Mr. Eshete on the morning of September 17, 2019.[4] (*See id.* at ¶44, 57.) However, these allegations are supported by nothing but inadmissible hearsay. And we have already determined that Mr. Karpinski was more interested in papering the file than in giving Ms. Kotoklo or Mr. Eshete a fair shake.

Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that an affidavit in support of a motion for summary judgment "set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Where "an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008). *See also Cariel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("[t]o be considered on summary judgment, evidence must be admissible at trial[.]")

---

[4]      To the extent that staff met with Mr. Karpinski, it was on September 5 *and not* September 17. (*See* P. SOF at ¶27.)

14

In this case, the evidence of complaints about Ms. Kotoklo comes from Mr. Karpinski and not directly from the alleged aggrieved staffers. Thus, these alleged complaints are classic hearsay and the Court should disregard them. *See id.* Similarly, the alleged complaints about Mr. Eshete from the access services staff (as alleged in paragraphs 44 and 57 of the defendants' statement of facts) are based on nothing more than Mr. Karpinski's and Ms. McMullin's testimony about meetings that allegedly occurred. Thus, they too are inadmissible hearsay that the Court should disregard. *See id.*

**E.        The Court should not permit Mr. Karpsinki to change his sworn testimony.**

In support of their motion for summary judgment, the defendants attempt to walk back deposition testimony where Mr. Karpinski swore that he noticed an improvement in Ms. Kotoklo's performance following her work with Ms. Frost. (P.SOF at ¶10.) In support of their motion, the defendants attach a declaration from Mr. Karpinski where, in paragraph 4, he claims he did not see any improvement in Ms. Kotoklo's performance. Thus, the defendants attempt to misuse and abuse the summary judgment procedure by presenting a sham affidavit. *See, e.g., James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[T]he sham–affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony"). Accordingly, the Court should disregard paragraph four of Mr. Karpinski's declaration, which is nothing more than an attempt to manufacture evidence by abrogating a prior sworn statement.

**Conclusion**

Mr. Karpinski understandably does not want to answer for his actions before a jury. However, this is a hole he dug for himself when he fired Ms. Kotoklo in violation of the civil rights laws. Accordingly, Ms. Kotoklo respectfully requests that the Court summarily deny the defendants' motion for summary judgment and set the matter for trial at its earliest convenience.

 Respectfully submitted,                                */s/ Fitzgerald T. Bramwell*

15

April 23, 2021                                    Fitzgerald T. Bramwell
                                                  LAW OFFICES OF FITZGERALD BRAMWELL
                                                  255 West Washington, Suite 2200
                                                  Chicago, Illinois 60606
                                                  312-924-2884 (voice)
                                                  bramwell@fitzgeraldbramwell.com

**Certificate of Service**

The undersigned, an attorney, certifies that on April 23, 2021, he caused the foregoing Mireille Kotoklo's Response and Objection To Defendants' Motion For Summary Judgment to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Katherine A. Manuel, Esq.
Jennifer Helen Kay, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
155 North Wacker Drive, Suite 4300
Chicago, Illinois 60606
katherine.manuel@ogletree.com
jennifer.kay@ogletree.com
*Counsel for defendants*

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
**LAW OFFICES OF FITZGERALD BRAMWELL**
255 West Washington, Suite 2200
Chicago, Illinois 60606
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com