# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Mireille Kotoklo, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-0635 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| DePaul University and Robert Karpinski, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination and retaliation suit comes before the court on cross motions for summary judgment filed by plaintiff Mireille Kotoklo ("Kotoklo") and defendants DePaul University ("DePaul") and Robert Karpinski ("Karpinski"). Kotoklo worked in DePaul's library for 18 years before she was terminated at Karpinski's instance in October 2019. Kotoklo, a black, female African immigrant, alleges that defendants discriminated and retaliated against her for advocating to Karpinski the unanimous recommendation of a hiring committee to select a black candidate for a library job. Defendants contend that Kotoklo was terminated for dishonesty and Karpinski's lack of confidence, due to allegedly poor job performance, in Kotoklo's ability to lead her department. *See* Defs.' Resp. to Pl.'s Stmt. Material Facts ("Defs.' Resp. to SMF") ¶ 33, ECF No. 84. For the following reasons, the court denies plaintiff's motion for summary judgment and grants defendants' motion as to plaintiff's discrimination claims but not her retaliation claims.

## I. Summary Judgment Standard and Objections to Fact Statements

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment bears the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Local Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor" (citations and quotations omitted)).

The parties' cross motions for summary judgment raise overlapping factual and legal questions on plaintiff's retaliation claims. The court applies the procedural requirements of Rule 56 separately to each cross motion. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Which party must "go beyond the pleadings and affirmatively . . . establish a genuine issue of material fact" depends on which party will bear the burden of proof on an issue at trial. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323); *see also Blow*, 855 F.3d at 797–98. The court therefore takes "a dual, 'Janus-like' perspective" on cross motions aimed at the same claim or defense. *Hotel 71*, 778 F.3d at 603 (citing *Shiner v. Turnoy*, 29 F. Supp. 3d 1156, 1160 (N.D. Ill. 2014)). On one motion, the court views the facts and inferences in the light most favorable to the nonmovant; but if summary judgment is not warranted, the court changes tack on the cross motion and gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* (citing *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 647–48 (7th Cir. 2003)).

### B. The Local Rule 56.1 Statements

This court's Local Rule ("LR") 56.1 requires the parties to file fact statements organizing and presenting their factual positions at summary judgment. Specifically, LR 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting LR 56.1(a)(3)). Each paragraph of the movant's facts must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." LR 56.1(a). Local Rule 56.1(b)(3)(B) requires the nonmoving party to

3

submit a response to each statement of fact provided by the movant, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  The nonmoving party may also present a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon."  LR 56.1(b)(3)(C).  "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."  *Id.*  Similarly, "[i]f additional material facts are submitted by the opposing party . . . the moving party may submit a concise reply in the form prescribed in that section for a response."  LR 56.1(a).  If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted.  *Id*.

Defendants' LR 56.1(b)(3) response begins with a general objection to plaintiff's LR 56.1(a)(3) statement of undisputed material facts.  Defs.' Resp. to SMF 1–2.  Defendants argue that many paragraphs of Kotokol's LR 56.1(a)(3) statement of undisputed facts "manipulate the record, ignore pertinent deposition testimony, and/or lack evidentiary support altogether."  *Id.* at 1.  The court will not consider this legal argument both because it is not specific enough to be useful and because legal argument in a LR 56.1(b)(3) response to a statement of undisputed material facts is improper.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (Gottschall, J.).  The court has considered defendants' objections to specific paragraphs of plaintiff's LR 56.1(a)(3) statement of undisputed material facts.  The court independently determines whether each paragraph mischaracterizes the evidence, whether the

evidence supports the proposition for which it is cited, and whether the material cited in response creates a genuine dispute of material fact. "[T]he Court has disregarded any . . . assertions of fact that lack proper evidentiary support or otherwise violate LR 56.1." *Alvarado v. Corp. Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 938 n.2 (N.D. Ill. 2010) (citing *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000)).

Kotoklo also objects to certain evidence on hearsay grounds and under what is sometimes called the sham affidavit rule. The court resolves those objections below as necessary.

## II. Summary Judgment Facts

The court takes the following facts from the parties' LR 56.1 statements of undisputed facts and responses. One citation is generally provided for facts appearing in more than one LR 56.1 fact statement or response. Because cross motions for summary judgment are pending, the following summary identifies disputed facts where appropriate.

DePaul is the largest Catholic university in the United States. Defs.' Resp. to SMF ¶ 4. In December 2018, Karpinski, a white man, became the Interim University Librarian. Pl.'s Resp. to Defs.' Stmt. Material Facts ("Pl.'s Resp. to SMF") ¶ 7, ECF No. 86; Defs.' Resp. to SMF ¶ 5. He also holds the title of Associate Vice President of Academic Affairs. Defs.' Resp. to SMF ¶ 5.

Born in the Republic of Côte d'Ivoire, Kotoklo, who is a black woman, is a naturalized United States citizen. *Id.* ¶¶ 2–3. DePaul hired Kotoklo as the Access Service Coordinator for its Lincoln Park library in November 2000. Pl.'s Resp. to SMF ¶ 5. Her "responsibilities included providing oversight and leadership for library access services, collaborating with other departments to continuously improve policies and procedures, serving as a library liaison, and maintaining awareness of best practices in academic librarianship." Pl.'s Resp. to SMF ¶ 6. Kotoklo had "never received progressive discipline pursuant to DePaul's progressive discipline policy" before Karpinski took charge of the library in 2018. Defs.' Resp. to SMF ¶ 22

5

(undisputed); *see also* Pl.'s Ex. A-1 at 2776–88 (personnel performance review signed by former manager Scott Walter on Sept. 28, 2018).[1]  In December 2018, Kotoklo reported to the Associate University Librarian for Information Technology and Discovery Services, Christine McClure ("McClure"), who in turn reported to Karpinski.  Pl.'s Resp. to Defs.' Stmt. Add'l Material Facts ("Pl.'s Resp. to SAF") ¶ 3, ECF No. 90.

### A. DePaul Policies and Practices

DePaul has a six-step progressive discipline policy.  ECF No. 63-5 at 1428–33.  In order of seriousness, discipline options range from verbal counseling, written counseling, final written counseling, addendum to counseling, a performance improvement plan, and discharge.  *Id.* at 1431–32.  Progressive discipline may begin at any step, however, and so termination may be the first and only step in progressive discipline.  *Id.* at 1431; Pl.'s Resp. to SMF ¶ 59.  However, a reasonable jury could find from this record that, in practice, it is unusual to fire an employee, particularly a long-term employee, without less drastic progressive discipline.  *See* Defs.' Resp. to Pl.'s Stmt. Add'l Material Facts ("Defs.' Resp. to SAF") ¶¶ 32–34, ECF No. 92 (partially disputed).

### B. December 2018–March 2019: Karpinski's Testimony About Complaints.

Karpinski testified that he had several meetings with library personnel between January–March 2019.  *See* Pl.'s Resp. to SAF ¶ 4.  According to Karpinski, he received numerous

---

1  Plaintiff's summary judgment exhibits, which overlap, are docketed as ECF Nos. 57, 86 and 87. Defendants' summary judgment exhibits can be found at ECF No. 63, but unlike plaintiff, defendants did not assign exhibit numbers or letters to their summary judgment exhibits.  The court therefore cites directly to ECF No. 63 when referring to defendants' summary judgment exhibits and cites plaintiff's summary judgment exhibits using the exhibit letters assigned in ECF No. 87.  Because not all of the exhibits have been paginated consistently, citations refer to the PageID number assigned by the CM/ECF system in ECF Nos. 63 and 87.  Citations to summary judgment exhibits omit the phrase "PageID #: XXXX."  For example, the citation "Pl.'s Ex. G at 3044" refers to plaintiff's exhibit G (ECF No. 87) at CM/ECF PageID #: 3044.

complaints about Kotoklo and the Access Services department.  *See* Pl.'s Resp. to SAF ¶¶ 4–5.

Karpinski testified that the staff members with whom he met described Access Services as an

island, complained that Kotoklo discouraged collaboration between library departments, stated

that Kotoklo became angry when others took initiative, and complained that Kotoklo "brow

beat" Access Services staff and created a hostile work environment.  *See* Pl.'s Resp. to SAF ¶ 5.

There is also evidence that Karpinski received complaints about Kotoklo's management and the

Access Services department on unspecified dates after March 2019.  *See* Pl.'s Resp. to SMF

¶¶ 23–26 (citing Karpinski Dep. Ex. 3, ECF No. 63-5 at 1423–24 (termination memorandum

dated Sept. 29, 2019)).

      Kotoklo objects on hearsay grounds to Karpinski's testimony and memorandum about the

complaints he received.  *See* Pl.'s Resp. to SMF ¶¶ 11, 23–26.  "Evidence supporting or opposing

summary judgment must be admissible if offered at trial, except that affidavits, depositions, and

other written forms of testimony can substitute for live testimony."  *Malin v. Hospira, Inc.*, 762

F.3d 552, 554–55 (7th Cir. 2014) (citing *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301

F.3d 610, 613 (7th Cir. 2002)); *see also generally Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742–

43 (7th Cir. 1997).  Hearsay is "a statement that the declarant does not make while testifying at

the current trial or hearing . . . [that] a party offers in evidence to prove the truth of the matter

asserted."  Fed. R. Evid. 801(c) (numbering and some punctuation omitted).

      Defendants state in their reply brief: "Defendants do not reference the many complaints

raised by Plaintiff's staff members to prove they are true.  Defendants offer the complaints to

demonstrate their impact on Karpinski and the reason he believed Plaintiff should be

terminated."  Defs.' Reply Supp. Mot. Summ. J. 9, ECF No. 91.  As will become clear below,

Karpinski's motives for terminating Kotoklo are disputed.  Defendants cannot rely on Karpinski

to prove that the complaints were in fact true. But Karpinski's testimony may be admitted for the non-hearsay purpose of explaining the effect the complaints he says he heard had on his decision to terminate Kotoklo. *See Boutros v. Avis Rent A Car Sys., LLC*, 802 F.3d 918, 924–25 (7th Cir. 2015); *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015). Accordingly, the court overrules Kotoklo's hearsay objections but considers the evidence of Karpinski's receipt of complaints only for the limited purpose for which defendants offer it.

Karpinski met with Kotoklo and McClure on March 21, 2019 ("March 21 meeting"). Pl.'s Resp. to SAF ¶ 6. What occurred at this meeting is partially disputed. The parties agree that Karpinski discussed the alleged complaints described above and said that he wanted to help Kotoklo work through the issues he had identified. *See* Pl.'s Resp. to SAF ¶¶ 6–7. It also appears to be undisputed that during the meeting, Kotoklo asked for specific examples of complaints about her. Defs.' Resp. to SMF ¶ 26.

Karpinski told Kotoklo to send him an email summarizing her understanding of the March 21 meeting, and she sent such an email later that day. *See* Pl.'s Resp. to SAF ¶ 8. In that email, Kotoklo asked Karpinski to provide examples of complaints he received from library staff so that she could "have the opportunity to give you my side of the story and maybe better understand where [the negative] perceptions are formed so I can work to address them. . . . I am ready to work with the guidance that you promised today to address the perceptions regardless." Kotoklo Dep. Ex. 8, ECF No. 63-2 at 1278.

Kotoklo disputes Karpinski's true motives for convening the March 21 meeting and his subsequent actions. She maintains that this meeting marked the beginning of a campaign, as she put it in a later email message to Karpinski, "to create a [false] paper trail" to be used as a pretext

for firing her.  *See* Defs.' Resp. to SMF ¶ 31 (quoting email dated June 20, 2019, Pl.'s Ex. G at 3039–44).

### C.  *March 2019–July 2019*

Kotoklo emailed Karpinski on April 18, 2019, seeking guidance on addressing the issues raised at the March 21 meeting.  Defs.' Resp. to SMF ¶ 27 (citing Pl.'s Ex. F at 3027).  Karpinski provided the promised examples of staff complaints about Kotoklo and her department at a meeting with Kotoklo on May 1, 2019 ("May 1 meeting").  Defs.' Resp. to SMF ¶ 29; Pl.'s Resp. to SAF ¶ 9.  The reason for the 40-day delay between the March 21 meeting and Karpinski's provision of a list of specific complaints is genuinely disputed.  *See* Karpinski Dep 152:22–155:1, ECF No. 63-3.  The record does not include detailed testimony from Karpinski or Kotoklo about these examples.  *See* Pl.'s Resp. to SMF ¶ 15.  Rather, the primary information about the examples comes from Kotoklo's June 20, 2019, email to Karpinski (*see* summary of June 20 email below).  *See* Pl.'s Ex. G at 3039–44.  As Kotoklo noted at her deposition, Karpinski's notes reveal that he received complaints from many white library staff members, yet he selected complaints from people of color to convey to Kotoklo at the May 1 meeting.  Kotoklo Dep. 37:22–42:5, Pl.'s Ex. D (PageID Nos. 2156–2226).  Viewed favorably to Kotoklo, Karpinski's cherry picking of complaints can be seen as an effort to stave off any race discrimination claim Kotoklo might raise.  After the May 1 meeting, Karpinski connected Kotoklo with Sarah Frost ("Frost"), DePaul's Director of Workplace Learning and Performance, who eventually scheduled a team building exercise with Kotoklo and Access Services staff for July 12, 2019.  *See* Pl.'s Resp. to SMF ¶¶ 15–16.

On June 20, 2019, Kotoklo sent Karpinski an email message ("June 20 email") in which she, among other things, said that she believed he was deliberately trying to "intimidate, silence and marginalize me, to try to create a paper trail, to try to build up a case against me."  Defs.'

Resp. to SMF ¶ 31; Pl.'s Ex. G at 3044. The six-page email responded in detail to several of the alleged examples of staff complaints Karpinski gave at the May 1 meeting. *See* Pl.'s Ex. G at 3039–44. Kotoklo concluded the June 20 email as follows:

> Please feel free to contact me if you have any question [sic] or if I failed to mention anything. I have been at DePaul for eighteen years, and I have to admit I have not seen a situation like this. I think the use of generalizations has for objective the protection of some staff members. This approach however is unfair and fosters distrust. I am happy you shared your findings and hope it will be the beginning of an honest conversation.

Pl.'s Ex. G at 3044.

Karpinski interpreted Kotoklo's behavior at the May 1 meeting and her June 20 email as a refusal to accept counseling. *See* Pl.'s Resp. to SMF ¶¶ 18–19. Within an hour of receiving it, Karpinski forwarded Kotoklo's June 20 email to a DePaul Human Resources officer and requested assistance crafting a response. Defs.' Resp. to SAF ¶ 9.

Effective July 1, 2019, Karpinski promoted Ashley McMullin ("McMullin") to the role formerly held by McClure, making McMullin Kotoklo's supervisor as of that date. Pl.'s Resp. to SMF ¶ 28. McMullin testified that, after sending an open call for applications, Karpinski hired McMullin without forming a search committee and without interviewing anyone else. *See* Defs.' Resp. to SAF ¶ 31 (citing McMullin Dep. 19:3–20:24, Pl.'s Ex. H (PageID Nos. 3050–95)). A genuine dispute on this point exists. Karpinski testified that three people expressed an interest in the position, that two of those people said they wanted to be considered, that he interviewed both, and that he selected McMullin. *See* Pl.'s Resp. to SMF ¶ 69 (citing Karpinski Dep. 278:14–281:4, Pl.'s Ex. E (PageID Nos. 2950–3025)).

### D. The July 12 Team Building Session

Frost conducted a team building session on July 12, 2019. *See* Pl.'s Resp. to SMF ¶ 29. Kotoklo participated in the morning team building session but left the room for the afternoon

session. *See id.* Whether Kotoklo or Frost suggested having Kotoklo leave the room is disputed. *See* Pl.'s Resp. to SMF ¶ 30; Defs.' Resp. to SAF ¶ 10. While Kotoklo was out of the room, members of the Access Services team engaged in an exercise in which they made lists of "things we're great at," "things that aren't going well," and "ideas to make things better." Pl.'s Resp. to SMF ¶ 31.

Examples of "things we're great at" include: "We recognize the great importance of working together as a team" and "Friendly and positive personas (w/coworkers and the DePaul university)." *Id.* Examples of "things that aren't going well" include: "Consistency at applying policy/procedure," "Communicate with other library departments," "Situational policy decisions from dept head: sometimes too flexible with external pressures, sometimes too inflexible with internal issues," and "Sometimes we are discouraged from communicating outside the department." ECF No. 63-14 at 1592-93.

The parties agree that Frost transcribed the lists made by the Access Services team and met with Kotoklo after the July 12 team building session, but they dispute whether Frost directed Kotoklo to create three to five specific goals based on the feedback from the July 12 team building session. *See* Pl.'s Resp. to SMF ¶ 32. Kotoklo testified that she and Frost did not discuss setting specific goals. *See* Kotoklo Dep. 157:1–10. Viewing this competing testimony favorably to Kotoklo, a reasonable jury could find that Frost did not clearly instruct Kotoklo to have a list of goals ready at the next meeting.

The next meeting occurred on August 23, 2019 ("August 23 meeting"). Frost, Karpinski, Kotoklo, and McMullin attended this meeting. Pl.'s Resp. to SMF ¶ 33. The purpose of the meeting was to discuss the feedback from the team building session as well as Kotoklo's goals in response to that feedback. *See id.* Karpinski testified that he expected Kotoklo to arrive at the

11

meeting with goals in mind, but he felt that she came unprepared with a blank legal pad. *See* Pl.'s Resp. to SAF ¶¶ 14–15; Pl.'s Resp. to SMF ¶¶ 34–35. Karpinski testified that he expected Kotoklo to arrive with goals in mind because Frost told him and McMullin that she directed Kotoklo to come to the meeting with between three and five goals. *See* Karpinski Dep. 84:22– 85:23, cited in Pl.'s Resp. to SMF ¶ 34. However, Frost later sent Karpinski an email stating that she "did not specifically instruct [Kotoklo] to bring [a list of goals] to the [August 23] meeting." Karpinski Dep. 87:16–21. At the August 23 meeting, Karpinski instructed Kotoklo to send McMullin a list of goals, and McMullin followed up with an email dated the same day asking Kotoklo to send her a list of goals before a meeting scheduled for September 4. ECF No. 63-2 at 1284. Defendants assert that Kotoklo missed this deadline. Pl.'s Resp. to SMF ¶ 36. That appears to be literally true insofar as there is no evidence that Kotoklo emailed a goal list prior to the September 4 meeting. However, McMullin sent Kotoklo an email on September 5, 2019, memorializing their September 4 meeting. ECF No. 63-2 at 1284. Seen favorably to plaintiff, the email confirms that Kotoklo and McMullin discussed a list of four to five goals Kotoklo proposed. *See id.* Indeed, McMullin told Kotoklo, "You came up with some wonderful ideas." *Id.* McMullin did not raise concerns in the email about not receiving the goals list prior to the meeting and instead asked Kotoklo to please send her the goals they discussed before September 12. *See id.*

### E. The Search for a Night Circulation Supervisor

Kotoklo chaired a three-person search committee to fill a vacancy in her department for a night circulation supervisor. Pl.'s Resp. to SMF ¶ 37. The other two search committee members also worked in the Access Services department: Travis Eastham (a white male), and Firouzeh Rismiller (a white female). Defs.' Resp. to SAF ¶ 13. Before they interviewed anyone, the committee identified Dilnessa Eshete, a black African immigrant and former DePaul library

employee who previously reported to Kotoklo, as the best qualified candidate and decided to

interview him and no one else.  Defs.' Resp. to SAF ¶ 14; Pl.'s Resp. to SMF ¶ 40.  Because

Eshete was a former DePaul employee who had been laid off in 2018, the search committee

obtained permission from someone in Human Resources to interview Eshete and no one else.

Defs.' Resp. to SAF ¶ 14.  DePaul apparently sometimes gives preference to former employees

who were let go due to downsizing.  *See id.*

On September 4, 2019, the outgoing night circulation supervisor contacted Karpinski

about Eshete's candidacy.  *See* Pl.'s Resp. to SMF ¶ 42.  The outgoing supervisor told Karpinski

"that Eshete was a 'terrible choice for [her] job' because '[h]is attendance problems and the

preferential treatment that he was afforded were two of the greatest contributions to the demise

of the work morale in the Access Services department.'"  *Id.* (quoting Karpinski Dec. Ex. B, ECF

No. 63-17 at 1604) (undisputed that these statements were made).  Eshete's attendance problems

resulted at least in part from his receiving cancer treatments, though neither Karpinski nor

McMullin knew the exact nature of his condition until this case was filed.  Pl.'s Resp. to SMF

¶ 47.  Kotoklo learned of Eshete's medical condition after he was let go in 2018.  Pl.'s Resp. to

SMF ¶ 48.

Karpinski emailed Kotoklo on September 5, 2019.  Pl.'s Resp. to SMF ¶ 43.  He

instructed her not to interview Eshete the next day, informing her that he had concerns about

Eshete's candidacy, and instructed her to interview the top three candidates for the night

circulation supervisor vacancy.  Pl.'s Resp. to SMF ¶ 43; Pl.'s Resp. to SAF ¶ 24.  Karpinski's

email stated in part,

> 1.) Please do not interview anyone tomorrow – first, all three resumes and cover
> letters should go to Ashley [McMullin] along with the other members of the search
> committee then the interviews should be scheduled.  In order for this process to
> have integrity, no one candidate can be seen to be receiving preferential treatment

during the interview process. If one of the candidates worked here previously, then providing him/her with an interview is acceptable.

2.) Schedule all three interviews in conjunction with the search committee and Ashley [McMullin]. Ashley [McMullin] would like to spend time with each candidate during this process.

3.) I would like the opportunity to speak with you and Ashley [McMullin] before you start the interviews. I have had several folks express concerns about one of the candidates you are considering. I need to share those concerns with you.

Pl.'s Ex. G at 3038. Kotoklo replied later that day to confirm that three interviews would be scheduled to accommodate McMullin's calendar. *See id.* at 3037.

Karpinski, Kotoklo, and McMullin met the next day, September 6, 2019. Defs.' Resp. to SMF ¶ 38. As with prior in-person meetings, what happened at the September 6 meeting is the subject of a genuine factual dispute. All agree that Karpinski and McMullin expressed concerns about accusations that Eshete had previously been unreliable and received preferential treatment. *See* Pl.'s Resp. to SMF ¶ 44. It also appears to be undisputed that Kotoklo told Karpinski and McMullin that Eshete's absences were due to his health issues. *See* Pl.'s Resp. to SMF ¶ 46; Defs.' Resp. to SAF ¶ 18. Kotoklo did not mention that she had once written up Eshete under DePaul's progressive discipline policy for not showing up for work on one occasion without calling to explain his absence. *See* Pl.'s Resp. to SMF ¶ 44. Whether Eshete's attendance issues and job performance issues all related to his illness is genuinely disputed, though Kotoklo considered them to be. *See* Pl.'s Resp. to SMF ¶ 46. McMullin testified as follows about this meeting:

Q. Now, you mentioned that Ms. Kotoklo told you at this time that Mr. Eshete had health problems. Did either you or Mr. Karpinski explore that at all?

A. I don't think that we asked what they were. It seemed like she was not being forthcoming about it. I mean she didn't come out and say, Dil[nessa Eshete] had

14

brain cancer at that time. She said he had health issues. And I did not explore it further.

McMullin Dep. 62:6–15.

There is a genuine dispute over whether and to what extent Karpinski believed Kotoklo had shown signs of improving. *See* Pl.'s Resp. to SMF ¶ 18; Defs.' Resp. to SAF ¶ 10. Karpinski testified that, as of the September 6 meeting, he believed that Kotoklo was "making progress" on the goals he set for her in March 2019, though he was not sure whether she was making "significant progress." *See* Karpinski Dep. 137:7–138:8. Karpinski's deposition testimony about whether he thought Kotoklo was making progress on certain performance goals is ambiguous and confusing. *See id*.

Kotoklo asks the court to disregard paragraph four of Karpinski's declaration as inconsistent with his deposition testimony, under what is sometimes called the sham affidavit rule. Pl.'s Resp. to Defs.' Mot. Summ. J. 15, ECF No. 85. Under this rule, a party may not "create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Dunn v. Menard, Inc.*, 880 F.3d 899, 910–11 (7th Cir. 2018) (quoting *Buckner v. Sam's Club, Inc*., 75 F.3d 290, 292 (7th Cir. 1996)). Some inconsistencies do not always turn out to be direct contradictions, however, and apparent contradictions can sometimes be explained, such as "because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Dunn*, 880 F.3d at 910–11 (internal quotations omitted); *see also Abraham v. Wash. Grp. Int'l, Inc*., 766 F.3d 735, 741 (7th Cir. 2014) (stating that a "sham affidavit" is "a descriptive term used to describe an affidavit that directly contradicts prior deposition testimony and therefore is considered generally insufficient to create a genuine issue of fact for trial, unless the contradiction is adequately explained") (internal quotations omitted); *Buckner*, 75 F.3d at 292

15

(affidavit may be used "to clarify ambiguous or confusing deposition testimony"). The Seventh Circuit has repeatedly cautioned that the sham affidavit rule should be applied "with great care" because the court cannot make credibility determinations or weigh the evidence at summary judgment. *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015)).

After reviewing Karpinski's declaration and deposition transcript, the court denies Kotoklo's motion to strike. In his summary judgment declaration, Karpinski attempts to limit his testimony that he believed Kotoklo was making "progress" on those goals to Kotoklo's participation in the team building exercise in July 2019. *See* Karpinski Decl. ¶ 4, ECF No. 63-16. Although the declaration is admissible, it does not preclude a jury from seeing it as inconsistent with Karpinski's deposition testimony and bearing upon his credibility. That is because, in context and viewed favorably to Kotoklo, Karpinski's testimony that he subjectively believed Kotoklo had made progress toward the March 2019 goals referred specifically to his notes of the September 6 meeting and his reasons for requiring three candidates to be interviewed. *See* Karpinski Dep. 137:4–138:8. Viewed favorably to Kotoklo, the notes lend further support to a finding that Karpinski believed Kotoklo had made some progress. *See* Karpinski Dep. Ex. 25 at 1, ECF No. 63-5 at 1437 (concerns that hiring Eshete would "erase any progress to date"). Thus, although Karpinski's declaration is admissible, it at most creates a genuine dispute for a jury on whether he believed Kotoklo to be improving eleven days before he decided to terminate her and whether his later, arguably inconsistent, statements evidence pretext.

Following the September 6 meeting, the search committee interviewed Eshete and the other two top candidates; McMullin also interviewed each candidate. *See* Defs.' Resp. to SAF

¶ 20.  At some point during the interview process, Eastham raised concerns about Eshete's attendance issues in the past.  *See* Pl.'s Resp. to SMF ¶ 49.  Kotoklo responded that his attendance issues were "due to sickness," but she did not specify the nature of his illness or disclose that she had issued progressive discipline to him before she was aware of the nature of his illness.  *See* Pl.'s Resp. to SMF ¶¶ 49–50.  It is undisputed that "[e]ach member of the Search Committee knew about Mr. Eshete's prior absence issues and that those prior attendance issues were caused by sickness."  Defs.' Resp. to SAF ¶ 23.  "Eshete received the highest score among the three candidates on his interview, and he received the second highest score with respect to reference checks."  Defs.' Resp. to SAF ¶ 22 (undisputed).

Sometime after the September 6 meeting (when is unclear), Karpinski contacted someone in Human Resources and inquired about Eshete's work history.  *See* Pl.'s Resp. to SMF ¶ 51.  Karpinski learned that Eshete took 36 sick days in 2017 and 31 sick days in the first half of 2018, as well as "22 unrecorded sick days" in 2017 and "14 unrecorded sick days" (the meaning of "unrecorded sick days" is unclear to the court) in the first half of 2018.  *Id.*  Kotoklo issued Eshete a written warning in 2017 for two unexcused absences from work.  *Id.*  The record does not contain any information on whether Eshete was entitled to use the sick days he took or whether DePaul policy allowed an employee's use of sick days to be considered as a negative factor when evaluating a job application.[2]

On September 10, 2019, McMullin scheduled a meeting with the search committee members for September 17, 2019.  The purpose of this meeting is disputed.  *See* Pl.'s Resp. to SMF ¶ 53.  One day before the scheduled meeting (September 16, 2019) at 4:48 p.m., Kotoklo

---

2.  Defendants point out that Kotoklo did not tell Human Resources personnel about Eshete's attendance history when she sought permission for the committee to interview him alone.  *See* Pl.'s Resp. to SMF ¶ 52.  The record does not indicate whether disclosing this information would have resulted in the denial of permission to interview just one candidate.  *See id.*

17

sent McMullin an email message stating that the search committee unanimously recommended that Eshete be hired for the night circulation supervisor position. Defs.' Resp. to SAF ¶ 23; Pl.'s Resp. to SMF ¶ 54.

### F. The September 17 meetings

The search committee, Karpinski, and McMullin attended a meeting on September 17 at 9:30 a.m. Pl.'s Resp. to SMF ¶ 55. It is undisputed that Karpinski made up his mind to terminate Kotoklo a few hours after the September 17 meeting. *Id.* ¶ 61. The parties agree that Karpinski and McMullin's concerns about Eshete's candidacy were discussed. It also appears to be undisputed that Kotoklo, and perhaps other members of the search committee, advocated the recommendation to hire Eshete, but Karpinski expressed (with inferences favorable to plaintiff) opposition to the recommendation. *See* Defs.' Resp. to SAF ¶¶ 24–25. Karpinski testified that it "was clear to [him]" that the committee was unaware of Eshete's attendance issues and disciplinary history. Karpinski Dep. 181:17–22. However, defendants do not dispute that all committee members knew about Eshete's prior absences due to sickness, but not the 2017 warning to Eshete issued by Kotoklo. Defs.' Resp. to SAF ¶ 23, Pl.'s Resp. to SMF ¶ 50.

Karpinski met with every member of the Access Services department except Kotoklo and Eastham (also on the search committee). Pl.'s Resp. to SMF ¶ 57. When this meeting occurred is disputed. McMullin testified that it likely occurred before September 17. *See* McMullin Dep. 68:6–18. Karpinski testified, based on his calendar, that this meeting occurred approximately two hours after the 9:30 a.m. meeting on September 17 (i.e., 11:30 a.m. on September 17). Karpinski Dep. 106:23–107:9, cited in Pl.'s Resp. to SMF ¶ 57. Karpinski testified that a member of the Access Services staff reached out to him to schedule the meeting, though it is not clear when that occurred. *See* Karpinski Dep. 97:20–98:9. According to Karpinski's testimony, which is not admissible for the truth of these matters, Access Services

18

staff members expressed concerns about the effect hiring Eshete would have on morale in the department given his attendance problems and perceived favoritism.[3]  *See* Pl.'s Resp. to SMF ¶ 57; Karpinski Dep. 121:20–122:21.

At some point after both meetings (again, the timeline is unclear), Karpinski decided not to accept the recommendation to hire Eshete, reconstituted the search committee with Kotoklo and McMullin as co-chairs, and started the hiring process anew.  *See* Pl.'s Resp. to SMF ¶ 58. Karpinski accepted the reconstituted committee's recommendation to hire a black man for the night supervisor position approximately two months later, after Kotoklo had been fired.  *See id.* Why Karpinski decided to make Kotoklo the co-chair of the reconstituted search committee even though he had decided to terminate her on September 17, 2019, has not been explained.  *See* Pl.'s Resp. to SMF ¶¶ 58, 61.

At 12:59 p.m. on September 17, Karpinski sent an email to someone in Human Resources to schedule a meeting about his decision to terminate Karpinski.  *See* Pl.'s Resp. to SMF ¶ 61 (citing ECF No. 63-5 at 1435-36).  DePaul did not use progressive discipline with Kotoklo. Defs.' Resp. to SAF ¶ 32.

On September 19, 2019, Kotoklo sent Karpinski an email explaining why she had recommended Eshete's hiring.  *See* Pl.'s Ex. G at 3047–48.  Importantly, there is no evidence that Karpinski's decision not to hire Eshete had been communicated to Kotoklo at this time.  In the September 19 email message, Kotoklo took pains to emphasize that she was not questioning Karpinski's rejection of the search committee's recommendation.  *See id.*  She reiterated her

---

3    Defendants' LR 56.1(a)(3) statement of undisputed material facts makes a list of several specific complaints and issues allegedly raised at this meeting.  *See* ECF No. 62 ¶ 57.  However, the citations to Karpinski and McMullin's depositions provided by defendants do not support the specific accusations made.  *See* Karpinski Dep. 97:12–99:11, 101:1–19, 106:23–107:22, ECF No. 63-3; McMullin Dep. 52:19–55:1.

reasons for thinking Eshete was the best-qualified candidate. *See id.* A jury could conclude from this email that Karpinski said he would not hire Eshete at the September 17 meeting with the search committee and that Kotoklo advocated his hiring at the same meeting. *See id.*

> Kotoklo concluded her email message by stating:

> I felt very uneasy to hear that Dilnesa [sic] received preferential treatment. I have always treated everyone the same way. I have extended the same flexibility regarding schedule and absences to all employees equally. Is it because he is African? There is so much difference between an Ethiopian and an Ivorian but people may not know. I treat everyone fairly.

> Is there another reason why we should not hire Dilnesa [sic]?

Pl.'s Ex. G at 3048.

### G. Kotoklo's Termination

Karpinski wrote a memorandum dated September 29, 2019, formally requesting Kotoklo's termination and explaining his reasons. *See* Pl.'s Resp. to SMF ¶ 62; Karpinski Dep. Ex. 3, ECF No. 63-5 at 1422–27 (termination memorandum dated Sept. 29, 2019). Karpinski wrote that he had lost confidence in Kotoklo's leadership abilities, particularly given her failure to disclose the warning she issued to Eshete in 2017 (Karpinski called this omission a lie to him and McMullin), and lack of collaboration with other library departments. *See* ECF No. 63-5 at 1425–26. Kotoklo's termination letter dated October 3, 2019, gave similar reasons for her termination:

> This letter is written to advise you that, effective October 3, 2019, your employment as Coordinator, Access Services in the Library at DePaul University is terminated. The decision to terminate your employment is based on management's lack of confidence in your ability to perform your job responsibilities at an acceptable level. Specifically, the erosion of trust and confidence in your inability to collaborate with other departments in the library as well as from your dishonesty as a coordinator. Most recently, the failure on your part to disclose to administration the Progressive Disciplinary Action Form you submitted to HR on behalf of a former employee you were actively attempting to rehire.

ECF No. 63-2 at 1296.

Kotoklo testified that at her October 3 termination interview Karpinski asked her again why she insisted upon hiring Eshete. *See* Pl.'s Resp. to SMF ¶ 64. Karpinski denies making this statement. *Id.*

### H. Comparison to Other Employment Matters

Kotoklo points to a number of inconsistencies and differential treatment that led her to conclude that she and Eshete were victims of discrimination. Among these, as discussed above, are that a jury could conclude that Karpinski hired McMullin without forming a search committee and after interviewing no one else. *See* Defs.' Resp. to SAF ¶ 31 (genuinely disputed).

Also, a jury could find that the fact that Karpinski became involved in the evening circulation supervisor hiring process at all was a substantial deviation from his ordinary practice. *See* Defs.' Resp. to SMF ¶ 11. The recommendation to hire Eshete is the only search committee recommendation Karpinski has rejected in his tenure as DePaul's librarian. Defs.' Resp. to SAF ¶ 28 (undisputed that this was the only hiring committee recommendation Karpinski had rejected).

Kotoklo chaired at least two search committees in 2019, searching for day and night circulation supervisors. *See* Defs.' Resp. to SMF ¶ 10. The parties dispute whether these jobs are substantially similar. *See id.* ¶ 11. There seems to be no dispute that the job duties are the same, although the library is busier during the day than it is at night. *See* McMullin Dep. 34:7–35:17. The search committee chaired by Kotoklo hired Matthew Wedge, a white man, for the daytime circulation supervisor position. Defs.' Resp. to SMF ¶ 11. Karpinski did not become involved in the hiring process or challenge the committee's hiring recommendation. *See id.* (citing Kotoklo Dep. 108:22–109:6).

Next, Kotoklo points to evidence that a white student with attendance issues was nevertheless encouraged to apply for the night supervisor position. Defs.' Resp. to SMF ¶ 71. However, although McMullin was aware of the student and his history of absences, it is undisputed that Karpinski did not know about the student applicant, his history of absences, or the fact that he was encouraged to apply. *See* Pl.'s Resp. to SMF ¶ 75. However, a jury could find that Kotoklo reasonably assumed that McMullin or another manager conveyed the details of the student applicant to Karpinski. Kotoklo Dep. 63:17–64:19. There is a genuine factual dispute over whether Kotoklo's assumption, undisputedly incorrect on this record, was nevertheless reasonable.

Finally, in 2018 a white DePaul employee named Cary Cline ("Cline") was allowed to transfer within DePaul's library system, despite having reported performance issues. Defs.' Resp. to SMF ¶ 72; Pl.'s Resp. to SMF ¶ 76. It is undisputed that Karpinski was unaware of any alleged performance problems with Cline. *See* Pl.'s Resp. to SMF ¶¶ 76–79.

### III. Analysis

The pending claims[4] alleged in Kotoklo's complaint arise under 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. § 5/1 et seq.; and the Illinois Whistleblower Act ("Whistleblower Act"), 740 Ill. Compl. Stat. 174/1 et seq. Plaintiff brings five counts of race and national origin discrimination under § 1981, Title VII, and the IHRA (counts I–III, VII, and VIII). She also brings two retaliation claims under § 1981 and Title VII

---

4    On January 25, 2021, Kotoklo filed a motion to voluntarily dismiss the counts of her complaint alleging claims of race and age discrimination (counts IX–XII). ECF No. 49. The motion was granted on January 28, 2021. ECF No. 51.

(counts IV and V) and an additional retaliation claim under the Whistleblower Act (count VI). Compl. 7–12.

The parties agree that, under Seventh Circuit law, Kotoklo's Title VII and 42 U.S.C. § 1981 discrimination and retaliation claims may be analyzed together at summary judgment. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008) (Title VII and § 1981 discrimination and retaliation claims are generally analyzed together at summary judgment); *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 933 (7th Cir. 2017) (analyzing Title VII and IHRA claims together); *Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 974 (N.D. Ill. 2014) ("At the summary judgment stage, courts generally apply the same analysis to discrimination claims brought under Section 1981 or the IHRA as they apply to Title VII claims." (collecting authority)).

### A. Use of Burden-Shifting Framework

The parties dispute whether the summary judgment evidence should be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As applicable to a claim of discrimination:

> Generally speaking, the plaintiff has the initial burden of establishing that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal quotation marks omitted), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*.

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (alteration in original). Defendants advocate the use of the *McDonnell Douglas* framework here while

Kotoklo urges the court to forego the burden-shifting analysis and instead consider the summary judgment evidence as a whole.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), the Seventh Circuit overruled its prior cases to the extent they relied on the distinction between "direct" and "indirect" methods of proving intentional discrimination. After *Ortiz*, "a plaintiff may utilize the *McDonnell Douglas* 'burden-shifting framework.' " *McDaniel v. Progressive Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *David*, 846 F.3d at 224). But "the *McDonnell Douglas* framework is not the only method plaintiffs may use to prove their claim. '[It] is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on . . . [a] proscribed factor." *Id.* (quoting *Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Regardless of how the plaintiff proceeds, *Ortiz* teaches that "the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of [a prohibited factor]." *Id.* (quoting *Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 720 (7th Cir. 2018)).

As the party with the burden of proof, the plaintiff generally has the choice whether to employ the *McDonnell Douglas* framework to prove her case at summary judgment. *See Joll v. Valparaiso Community Schools,* 953 F.3d 923, 929 (7th Cir. 2020) (" 'To clarify and to simplify' her task, a plaintiff may choose to enlist the burden-shifting framework of *McDonnell Douglas*." (citations omitted)). Kotoklo resists application of the *McDonnell Douglas* framework in favor of *Ortiz*. *E.g.*, Pl.'s Resp. to Defs.' Mot. for Summ. J. 9. Post-*Ortiz*, the Seventh Circuit has stated that the *McDonnell Douglas* framework remains "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly

situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (quoting *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500 (7th Cir. 2017)). Kotoklo does not make comparators to herself a primary focus at summary judgment, though she draws numerous distinctions between Karpinski's handling of the hiring of Eshete and candidates for other jobs. *See, e.g.*, Resp. to Mot. Summ. J. 9–19. The court therefore analyzes Kotoklo's claims in accordance with her wishes, under *Ortiz*.

### B. Retaliation Claims

Title VII's anti-retaliation provision forbids "an employer to discriminate against any . . . employee[ ] . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). To survive summary judgment on a timely retaliation claim, plaintiff must offer evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Logan v. City of Chi.*, 4 F.4th 529, 538 (7th Cir. 2021) (quoting *Skiba*, 884 F.3d at 718).

No party disputes that Kotoklo's termination was an adverse employment action. *See, e.g.*, *Logan*, 4 F.4th at 538. But the parties are at issue over whether Kotoklo engaged in protected activity and whether a jury could find a causal connection between the protected activity and her firing. The court begins with the causation question.

#### 1. The timing of Karpinski's decision to terminate Kotoklo creates a fact issue on causation.

Defendants maintain that the record shows that Kotoklo would have been fired regardless of whether she engaged in any protected activity. The court need not delve deeply into the evidence of causation because this is the rare case in which the timing of the termination decision is by itself sufficient to create a fact issue on causation.

25

It is undisputed that Karpinski made up his mind to fire Kotoklo within hours of the September 17 meeting. Defs.' Resp. to SAF ¶ 36. As discussed more fully below, Kotoklo's retaliation theory is that she was opposing Karpinski's unlawful discrimination against Eshete at the September 17 meeting, and Karpinski fired her for her opposition. "[T]iming by itself will rarely support an inference of retaliation, but it may do so '[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.' " *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)); *see also Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021). How close in time must the adverse action be? The defendant in *Lord* fired the plaintiff two days after he complained about workplace harassment, which was activity protected by Title VII. *See* 839 F.3d at 564. The Seventh Circuit held that this short interval permitted an inference of causation based on timing alone. *Id.* The interval between protected activity and the decision to terminate Kotoklo was indisputedly shorter—mere hours. *See* Defs.' Resp. to SAF ¶ 36. Thus, a reasonable jury could find that Kotoklo's advocacy for Eshete caused Karpinski to decide to fire her.

> *2. Genuine fact disputes exist over whether Karpinski had an objectively reasonable belief that Kotoklo was opposing prohibited discrimination against Eshete at the September 17 meeting.*

A wide variety of employee conduct can constitute protected activity for anti-retaliation purposes. For instance, "[s]upporting a colleague's charge of discrimination by refusing to retaliate against that colleague is protected activity." *Robinson v. Perales*, 894 F.3d 818, 831 (7th Cir. 2018) (citation omitted). There is no evidence that Eshete filed a charge of discrimination, however.

Defendants argue that no reasonable jury could find that Kotoklo was engaging in statutorily protected activity before Karpinski decided to terminate her on September 17, 2019. Defs.' Resp. to Pl.'s Mot. Partial Summ. J. 3–6, ECF No. 82. Kotoklo replies that her advocating for the hiring of Eshete at the September 17 meeting constituted protected activity. Pl.'s Reply Supp. Mot. Partial Summ. J. 5–6, ECF No. 89.

Defendants cite two Seventh Circuit cases in support of their position. *See* Defs.' Resp. to Pl.'s Mot. Partial Summ. J. 4–5. In both cases, the plaintiff did not complain about or oppose alleged discrimination against a fellow employee. Instead, the plaintiffs claimed that their employers retaliated against them for complaining about discrimination against them (rather than another employee). The complaints were made in correspondence to the employer, a grievance filed with the employer, or in a charge of discrimination filed with the Equal Employment Opportunity Commission. *See Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655 (7th Cir. 2012) (correspondence sent to employer); *Tomanovich v. City of Indianapolis*, 457 F.3d 656 (7th Cir. 2006) (plaintiff filed grievances with employer and a charge of discrimination). In affirming summary judgment for the employer, the Seventh Circuit applied the following rule: "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663 (internal citations omitted); *accord Smith*, 674 F.3d at 658.

Seventh Circuit law distinguishes between retaliation for complaining about discrimination experienced by the plaintiff and retaliation for the plaintiff opposing

discrimination against another employee or job applicant. *See Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998). *Talanda* illustrates the distinction. There, Paul Talanda, the plaintiff, supervised a fast-food restaurant. 140 F.3d at 1092. His manager instructed him not to permit an employee to work as a cashier (she was permitted to work in the kitchen) because she had visible missing teeth, and Talanda's supervisor thought she would not make a good impression on customers. *See id.* at 1092–93. Talanda disobeyed, believing the directive to be immoral and an example of disability discrimination, but even when his superiors directly asked him, he "did not state that he believed [his supervisor's] order was illegal or improper." *Id.* at 1094. Talanda was terminated after his superior learned that he had continued to permit the employee to work as a cashier. *See id*. at 1093. To decide whether Talanda engaged in protected activity, the Seventh Circuit asked whether Talanda "acted 'in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination.'" *Id.* at 1096 (quoting *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1459 (7th Cir. 1995)).

Under this standard, Kotoklo did not have to say at the September 17 meeting that she thought prohibited discrimination was occurring. As *Talanda* demonstrates, for retaliation based on opposition to discrimination against another employee to be actionable, the plaintiff need not advise the employer that she believes that discrimination has occurred in so many words. The plaintiff need only have taken "some step in opposition to a form of discrimination that the statute prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011); *see also, e.g.*, *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021); *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 668 (7th Cir. 2017); *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752–53 (7th Cir. 2002). The court therefore inquires whether Kotoklo subjectively believed that she was opposing statutorily prohibited conduct on September 17, 2019, and whether her belief was

28

objectively reasonable. *See Scheidler v. Indiana*, 914 F.3d 535, 543 (7th Cir. 2019), *reh'g and suggestion for reh'g en banc denied* (Mar. 1, 2019); *see also Scheidler*, 914 F.3d at 542.

Beginning with the subjective component of the good faith analysis, defendants maintain that the first arguable instance when Kotoklo engaged in statutorily protected activity is her September 19 email suggesting Eshete and Kotoklo's race and national origin were involved in Karpinski's decisionmaking process. *See* Defs.' Resp. to SMF ¶ 75. The inferences to be drawn from this email are genuinely disputed. *See id.* Defendants reason that, regardless of the dispute about whether the September 19 email raised an allegation of discrimination, the email cannot support Kotoklo's retaliation claim because Karpinski made up his mind to fire Kotoklo two days before the email was sent. *See id.* ¶ 21 (undisputed that Karpinski decided to fire Kotoklo on Sept. 17, 2019).

Defendants overlook Kotoklo's deposition testimony about the September 17 meeting, however. *See* Pl.'s Resp. to SAF ¶ 34 (citing this testimony). Kotoklo answered several questions about why she thought Karpinski was discriminating against Eshete. *See* Kotoklo Dep. 118:22–122:14. Kotoklo answered that she "could see it" (Karpinski's discrimination) and explained by citing examples of what she considered to be Karpinski holding Eshete to a higher standard than other library staff. *See id.* In context, a reasonable jury disposed to view this testimony favorably to Kotoklo could find that at the September 17 meeting (or possibly earlier), she first formed a belief that Karpinski was engaging in prohibited discrimination. *See id.*; *see also Logan*, 4 F.4th at 538 (plaintiff's testimony sufficient to establish when he formed a subjective belief he was opposing discrimination).

A plaintiff's belief that she opposed prohibited discrimination must also be objectively reasonable. *Scheidler*, 914 F.3d at 942. The plaintiff need not "have opposed an action that in

fact violated Title VII to win a retaliation claim." *Fine*, *supra*, 305 F.3d at 752 (citations omitted). Since "[i]t is improper to retaliate against anyone for claiming a violation of Title VII unless that claim is 'completely groundless,' " the court does not perform a full analysis of whether the conduct the plaintiff opposed violated the statute. *Id.* (citation omitted); *see also Logan*, 4 F.4th at 538 (citing *Lord, supra*, 839 F.3d at 563). The court instead asks "merely whether [the conduct the plaintiff opposed] falls into the category of conduct prohibited by the statute." *Logan*, 4 F.4th at 538 (quoting *Lord*, 839 F.3d at 563).

The Seventh Circuit held that a trial was required on the objective reasonableness of plaintiff's opposition to prohibited discrimination in *Fine*, 305 F.3d at 752–53. The record there showed that the plaintiff, a female pilot, knew that a supervisor had denied her requests for training and that she began experiencing delays her male coworkers did not experience when she attempted to schedule other training needed to obtain a promotion. *See id.* at 752. She had also heard from other female employees that they were experiencing similar delays, and the plaintiff encountered roadblocks when attempting to access her personnel file while male coworkers did not. *See id.* The Seventh Circuit held that it was "impossible to conclude as a matter of law on this record that [the plaintiff] had no grounds for believing that [her employer's] actions violated Title VII." *Id.*

Similarly here, Kotoklo testified, with favorable inferences, that she concluded that discriminatory animus drove Karpinski's handling of Eshete's candidacy because she believed nothing else could explain his more favorable treatment of white employees and job applicants. *See* Kotoklo Dep. 118:22–122:14. Specifically, Kotoklo testified that she thought discrimination was occurring because: (1) Eshete received the hiring committee's highest overall rating; (2) Cline's performance issues were overlooked in 2018 (though it is undisputed that Karpinski

did not know about Cline's issues, Pl.'s Resp. to SMF ¶ 77) while Eshete's alleged performance problems were given as a reason to interview other candidates; (3) Karpinski did not become involved in the process that led to Wedge's hiring for the daytime circulation supervisor position (white male), but Karpinski scrutinized closely the committee's recommendation to hire Eshete and dug into his personnel records; and (4) Karpinski hired McMullin, a white woman, in 2019 without interviewing other candidates but insisted on interviewing the three most qualified candidates for Eshete's position. *See* Kotoklo Dep. 118:22–128:22, 132:10–23, 169:12–170:24. Multiple inferences can be drawn from these facts, and some of the facts underlying Kotoklo's reasons are genuinely disputed. Nonetheless, *Fine* teaches that the multiple instances of differential treatment Kotoklo observed and experienced suffice to carry her burden to create a fact issue for trial on whether her subjective belief that she opposed prohibited discrimination by her employer was objectively reasonable. *See Fine*, 305 F.2d at 752; *see also Brooks v. City of Kankakee*, 7 F.4th 649, 662 (7th Cir. 2021).

In sum, genuine disputes of material fact exist as to the causation and protected activity elements of plaintiff's retaliation claims. The court therefore denies the cross motions for summary judgment on plaintiff's retaliation claims.

### C. Whistleblower Act Claim

Kotoklo's claim under § 20 of the Illinois Whistleblower Act relates closely to her retaliation claims. To sustain this claim, Kotoklo must establish "(1) she refused to participate in an activity that would result in a violation of a state or federal law, rule or regulation and (2) her employer retaliated against her because of the refusal." *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 48 (citing 740 Ill. Comp. Stat. § 174/20 (West 2010); 740 ILCS 174/20 (West 2010)). Defendants argue that plaintiff has not establish the first element

because she has produced no evidence that she refused an instruction from Karpinski to remove Eshete from contention for the night circulation supervisor vacancy.

The court agrees. As already explained, there is a genuine dispute over whether Kotoklo held an objectively reasonable good faith belief she was opposing prohibited discrimination against Eshete at the September 17 meeting and that she advocated Eshete's candidacy at that meeting and in her September 19 email to Karpinski. However, the September 19 email, even viewed favorably to Kotoklo, cannot be interpreted as a refusal. On the contrary, Kotoklo repeatedly states in the email message that Karpinski's decision regarding Eshete's candidacy "prevails." Pl.'s Ex. G at 3047–48. Kotoklo attempts to create a fact issue by pointing to her disputed testimony about the October 3 meeting at which she was formally terminated. According to Kotoklo, Karpinski (although Eshete was no longer in contention) asked her why she "insisted on hiring" Eshete. *See* Defs.' Resp. to SAF ¶ 37; Kotoklo Dep. 177:24–178:2. Seen in the light most favorable to Kotoklo, the fact that Karpinski asked this question does not create a fact issue on whether Kotoklo refused to do anything. *See ibid.*; *see also Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 671 (7th Cir. 2008); *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, at *4 (N.D. Ill. July 18, 2017).

### D. *Discrimination Claims*

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As with her retaliation claims, Kotoklo's termination constitutes a paradigmatic adverse employment action under Title VII's anti-discrimination provision. *E.g.*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). To sustain a discrimination claim, "the plaintiff must present evidence which, taken as a whole, 'would permit a reasonable factfinder to conclude that the

plaintiff's race . . . caused the discharge.' " *Bless v. Cook Cty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021) (quoting *Ortiz*, 834 F.3d at 765); *accord Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Although the court analyzes the evidence under *Ortiz*, cases employing the *McDonnell Douglas* framework remain relevant to the analysis. *See Ortiz*, 834 F.3d at 766 ("Today's decision does not concern *McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently.").

Kotoklo relies primarily on *Joll v. Valparaiso Community Schools,* 953 F.3d 923, 929 (7th Cir. 2020), a case of sex discrimination filed by a woman who unsuccessfully applied for a job coaching high school sports. *See* Pl.'s Resp. to Defs.' Mot. Summ. J. 9–14. As stated in *Joll*, Kotoklo "must provide either direct or circumstantial evidence that supports an inference of intentional discrimination" to survive summary judgment outside the *McDonnell Douglas* framework. 953 F.3d at 929 (citing *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009)). The Seventh Circuit has "identified three broad categories of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment. *Id.* (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). The plaintiff in *Joll* provided "some of each type" of circumstantial evidence. *Id.*

Kotoklo does not expressly sort her evidence into *Joll*'s categories (nor is she required to), but she identifies three broad fact questions that she contends require a trial. *See* Pl.'s Resp. to Defs.' Mot. Summ. J. 10–14. Kotoklo argues first that a jury could find that, beginning with

33

the March 21 meeting, Karpinski was attempting disingenuously to create a paper trail to be used to justify his decision to fire her. *See id.* at 10–12. Second, Kotoklo argues that a reasonable jury could find that Karpinski afforded white employees "more leeway" than Kotoklo and Eshete, who are both black African immigrants. *Id.* at 12–13. Finally, based on the same evidence, Kotoklo contends that Karpinski "does not like" African immigrants, meaning that he harbors discriminatory bias. *See id.* at 13–14. Kotoklo relies on the following facts, many of which are disputed:

- Karpinski took 40 days to provide Kotoklo with the specific examples of the general performance issues discussed at the March 21 meeting. *See* Defs.' Resp. to SAF ¶¶ 5–7. By contrast, Karpinski forwarded Kotoklo's June 20 email responding to his examples to someone in Human Resources within an hour of receiving it. *Id.* ¶ 8.

- In Kotoklo's absence, members of the Access Services team produced a list of several positive statements about the team as a whole (as well as several negative ones) at the July 12 coaching session. *See* Defs.' Resp. to SAF ¶ 11.

- Karpinski deviated from DePaul standard practice by recommending Kotoklo for termination without progressive discipline. *See* Defs.' Resp. to SAF ¶¶ 32–34. Yet a jury could reasonably conclude that Karpinski believed that Kotoklo was making progress improving her performance as recently as September 6, 2019. Pl.'s Resp. to SMF ¶ 4; Defs.' Resp. to SAF ¶ 35.

- Karpinski's statement that interviewing three candidates was necessary to protect the integrity of the hiring process conflicts with his handling of McMullin's hiring. With favorable inferences to plaintiff, Karpinski did not interview anyone

34

else for McMullin's position and did not form a search committee. Defs.' Resp. to SAF ¶ 31 (disputed).

- Karpinski shared information selectively. A reasonable jury could find that he did not tell the access service personnel who complained about Eshete's candidacy that Kotoklo had told him that Eshete's absences resulted from an illness. *See* Defs.' Resp. to SAF ¶¶ 18–19.

- It is undisputed that neither Karpinski nor McMullin knew that Eshete's absences were cancer-related. Pl.'s Resp. to SMF ¶ 47. But neither Karpinski nor McMullin asked about the nature of Eshete's illness at the September 6 meeting, and they never told library staff that Eshete's absences may have resulted from illness, as Kotoklo told them on September 6, 2019. Defs.' Resp. to SAF ¶¶ 18–19. Defendants dispute the inferences to be drawn here.

A jury viewing the summary judgment evidence as a whole in plaintiff's favor could reasonably conclude that Karpinski set out in March 2019, or earlier, to create a paper trail supporting Kotoklo's termination and that he pursued that objective in a one-sided way. But plaintiff must come forward with enough evidence to create a fact issue on whether Karpinski's true reason for creating the trail was prohibited discrimination. *See, e.g.*, *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 402–03 (7th Cir. 1992); *Morris v. Vanderburgh Cnty. Health Dep't*, 58 F. App'x 654, 657 (7th Cir. 2003). One way to do this is to produce "evidence indicating that the complaints against [the employee] were fabricated or unfounded." *Anderson*, 965 F.2d at 402; *accord Morris*, 58 F. App'x at 657; *Swanson v. Allstate Ins. Co.*, 102 F. Supp. 2d 949, 973 (N.D. Ill. 2000); *see also Igasaki*, 988 F.3d at 958. This is the method Kotoklo attempts to use here. "Although general averments of adequate performance are insufficient to create a

35

factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir.1994) (citing *Komel v. Jewel Cos.*, 874 F.2d 472, 474–75 (7th Cir. 1989)).

Kotoklo points to two pieces of evidence to show that the complaints against her were unfounded. The first is her June 20 email message to Karpinski rebutting the specific examples of complaints he received from staff in Access Services. *See* Defs.' Resp. to SMF ¶ 31. The June 20 email message does not create a fact issue because an employee's disagreement with a supervisor's assessment, though sincerely and strongly held, does not by itself create a fact issue. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir. 2004) ("An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance.") (citing *Dey*, 28 F.3d at 1460); *Gustovich v. AT & T Communications Inc.*, 972 F.2d 845, 848 (7th Cir. 1992).

Second, Kotoklo argues that the list of the Access Services department's strengths and weaknesses from the July 12 team building session creates a genuine conflict with Karpinski's testimony that he received complaints from Access Services team members. The list consists of broad statements such as, "We do a lot of process oriented work that is fundamental to library functioning but is not exciting or 'sexy'—and we do it well." Defs.' Resp. to SAF ¶ 11. Even seen in the light most favorable to Kotoklo, the positive statements from the team building session are too broad to refute the specific alleged staff complaints set forth in Kotoklo's June 20

message.  *See id.*  Thus, Kotoklo has not pointed to summary judgment evidence showing that the complaints against her were fabricated or unfounded.[5]

Turning to Kotoklo's arguments that Karpinski gave white employees more leeway than African immigrants, an employer's deviation from standard procedures and established practices can lend support to an inference of intentional discrimination.  *E.g.*, *Joll*, 953 F.3d at 931 (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) (other citations omitted)); *see also Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012).  To support an inference of discrimination based on a factor prohibited by Title VII, plaintiff must generally identify a similarly situated comparator where, as here, she relies on circumstantial evidence of disparate treatment in order "to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus."  *Coleman,* 667 F.3d at 846 (quoting *Humphries*, *supra*, 474 F.3d at 405).

To show that a comparator is "similarly situated," the plaintiff "must at least show that the comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him."  *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (internal quotations and alterations omitted).  On a claim that an employee received harsher discipline based on a protected characteristic, the plaintiff must

---

5.  Although the court does not weigh the evidence at summary judgment, the list of things that are not going well from the July 12 team building session can be read as corroborating some of the complaints Karpinski testified he received.  The list identifies challenges such as: "Consistency at applying policy/procedure;" "Communicate with other library departments;" "Situational policy decisions from dept head: sometimes too flexible with external pressures, sometimes too inflexible with internal issues;" and "Sometimes we are discouraged from communicating outside the department."  ECF No. 63-14 at 1593–94.

establish that she "is similarly situated with respect to performance, qualifications, and conduct." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 733 (7th Cir. 2004) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000), *overruled on other grounds by Ortiz, supra*.

Kotoklo identifies no DePaul employee whom she contends was not terminated or was treated more favorably for comparable perceived conduct. *See* Pl.'s Resp. to Defs.' Mot. Summ. J. 9–14. True, Karpinski indisputedly did not attempt to utilize DePaul's progressive discipline policy before recommending Kotoklo's termination, even though a jury could find from disputed facts that Karpinski believed Kotoklo's performance was improving after the July 12 team building session. *See* Defs.' Resp. to SAF ¶¶ 10, 32. But Kotoklo points to no evidence that he treated a similarly situated person better. Kotoklo has introduced evidence that DePaul has terminated two employees (not described) without progressive discipline in the 13 years before Kotoklo's termination. Defs.' Resp. to SAF ¶ 33. But Kotoklo does not attempt to compare herself to any specific case handled by Karpinski or another supervisor in which less serious consequences were meted out to a person who did not share her race and national origin. *See id.* ¶¶ 33, 34. This evidence is insufficient to create a fact issue. *See, e.g.*, *Gamble v. FCA US LLC*, 993 F.3d 534, 539 (7th Cir. 2021); *Igasaki*, *supra*, 988 F.3d at 958 (citing *Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d 887, 895–96 (7th Cir. 2018)); *Watkins v. Riverside Med. Ctr.*, 758 F. App'x 547, 550 (7th Cir. 2019).

Kotoklo also compares Karpinski's handling of Eshete's candidacy to Karpinski's treatment of white employees and job applicants. She contrasts Karpinski's involvement in the hiring process for the night circulation supervisor vacancy, and his ultimate rejection of Eshete's candidacy, with Karpinski's handling of four other matters: (a) Karpinski's non-involvement in the hiring by a search committee chaired by Kotoklo of a white man, Matthew Wedge, for the

38

day circulation supervisor vacancy in 2019; (b) the fact that a student with an unspecified history of attendance problems was encouraged at some point to apply for the night circulation supervisor vacancy ; (c) the fact that Cary Cline, another DePaul library employee, was permitted in 2018 (whether this was before Karpinski's tenure is not entirely clear) to transfer to another library department despite having reported performance problems; and (d) the disputed fact that Karpinski hired McMullin, a white woman, in 2019 for a higher-level library position without forming a search committee and without interviewing anyone else. *See* Defs.' Resp. to SMF ¶ 11; Pl.'s Resp. to SMF ¶¶ 71, 75; Defs.' Resp. to SAF ¶ 31.

The primary problem for Kotoklo with these comparisons is Karpinski's testimony that he became involved in Eshete's hiring after receiving complaints (email dated September 4) about Eshete's absenteeism, performance, and the negative impact his potential hiring would have on morale. *See* Pl.'s Resp. to SMF ¶ 42 (not used for the truth of the complaints). There is no evidence that any similar red flags were raised about Wedge's candidacy for the day circulation supervisor vacancy. *See id.* ¶ 71. As for the student being encouraged to apply for the night circulation supervisor role, the undisputed evidence shows that Karpinski did not know about the encouragement or the student's history of absences. *Id.* ¶ 75. And it is undisputed that Karpinski was unaware of any alleged performance problems with Cline. *See id.* ¶¶ 77. Although hiring McMullin without an interview appears inconsistent with Karpinski's reason (protecting the integrity of the process) for directing that three candidates be interviewed for the night circulation supervisor vacancy, there is no evidence that Karpinski had received any complaints from McMullin's potential future colleagues before he hired her. *See id.* ¶ 28; Defs.' Resp. to SAF ¶ 31. These differences preclude a finding that they are similarly situated on this record. *See Gamble*, 993 F.3d at 539; *Watkins*, 758 F. App'x at 550.

Finally, Kotoklo makes what at first appears to be a distinct argument that she has produced evidence of conduct suggesting that Karpinski "did not like black immigrants." Pl.'s Resp. to Defs.' Mot. Summ. J. 13. She relies primarily on the Seventh Circuit's decision in *Joll*, *supra*. *See id.* at 9–10. In *Joll*, the plaintiff provided evidence from which a reasonable jury could find, among other things, that the men who interviewed the female plaintiff "were indulging [sexist] stereotypes" about female applicants. 953 F.3d at 930. The inference could be drawn by comparing the questions the interviewers asked male and female applicants. *See id*. The female plaintiff received questions about her commitment to the job, but the interviewers did not raise similar questions with male applicants. *See id.*

Kotoklo points to no similar ambiguous comments or conduct on Karpinski's part, such as comments that could be interpreted as evincing bias based on race or national origin. *Cf.*, *Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008) (holding evidence that supervisor transferred every Muslim out of his department could constitute evidence of supervisor's discriminatory animus); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786, 788–89, 792 (7th Cir. 2007) (plaintiff produced evidence that supervisor "made at least eighteen sex-based comments" to the plaintiff). Kotoklo contends instead that Karpinski's negative behavior toward Kotoklo and Eshete shows that he harbored discriminatory animus. Pl.'s Resp. to Defs.' Mot. Summ. J. 13. The behavior to which she points, however, turns out to be the same evidence underlying her claim that she and Eshete received disparate treatment at Karpinski's hands, such as her allegations that Karpinski set out to "paper the file" to create a justification for terminating her. *See id.* For the reasons discussed above, that evidence is insufficient to create a fact issue on discriminatory animus. Viewing the evidence as a whole and in the light most favorable to

plaintiff, *Ortiz*, 834 F.3d at 566, Kotoklo has not identified evidence sufficient to create a fact issue on her race and national origin discrimination claims.

### IV. Conclusion

For the reasons stated, plaintiff's motion for summary judgment on her retaliation claims is denied, and defendants' cross motion for summary judgment is granted in part and denied in part. Plaintiff's race and national origin discrimination claims (counts I–III, VII, and VIII) are dismissed. Plaintiff's claim under the Illinois Whistleblower Act (count VI) is dismissed. Genuine disputes of material fact preclude entry of summary judgment on plaintiff's retaliation claims under 42 U.S.C. § 1981 and Title VII (counts IV and V).

Dated: September 30, 2021

/s/
Joan B. Gottschall
United States District Judge

41